**SYLVIA M., Appellant,**

v.

**DALLAS COUNTY CHILD WELFARE UNIT OF THE TEXAS DEPARTMENT OF HUMAN SERVICES, Appellee.**

No. 05–88–00119–CV.

Court of Appeals of Texas, Dallas.

May 8, 1989.

Nathan E. White, Jr., Dallas, for appellant.

Timothy B. Couch, Dallas, for appellee.

Before WHITHAM, BAKER and THOMAS, JJ.

THOMAS, Justice.

This is an appeal by Sylvia M. (Mother) from an involuntary termination of her parental rights.[1] In four points of error, Mother complains of the legal and factual sufficiency of the evidence to support the jury's findings that: (1) she knowingly placed or knowingly allowed each of her children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) she engaged in conduct which endangered the physical or emotional well-being of each of the children; (3) she knowingly placed each of the children with persons who engaged in conduct which endangered their physical or emotional well-being; and (4) that termination of her parental rights was in the best interest of each child. In two additional points, Mother complains of ineffective assistance of counsel and the trial court's failure to appoint an attorney ad litem to represent her in the trial proceedings. We find no merit in these arguments and affirm the trial court's judgment.

## STANDARD OF REVIEW

A "legally insufficient" point is a "no evidence" point presenting a question of law. In deciding that question, we must consider only the evidence and the inferences tending to support the finding and disregard all evidence and inferences to the contrary. *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985). If a "no evidence" point is sustained and the proper procedural steps have been taken, the finding under attack may be disregarded entirely and judgment rendered for the appellant unless the inter-

---

1. The parental rights of L.M. (Father) were also terminated at the same time; however, he has not filed an appeal.

ests of justice require another trial. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). It is fundamental that these fact findings must be upheld if there is more than a scintilla of evidence in support thereof. *Stedman v. Georgetown Sav. & Loan Ass'n*, 595 S.W.2d 486, 488 (Tex.1979). In reviewing "factually insufficient" points, we consider all the evidence including any evidence contrary to the judgment. *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex. 1980). The jury's verdict can be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). Applying these principles, we must first determine if there is evidence of probative value to support the jury's findings.

A termination suit involves constitutional dimensions and therefore is not an ordinary civil suit. The burden of proof necessary to involuntarily terminate parental rights is proof by clear and convincing evidence. *In re G.M.*, 596 S.W.2d 846, *passim* (Tex.1980); *Doria v. Texas Dep't of Human Resources*, 747 S.W.2d 953, 955 (Tex.App.—Corpus Christi 1988, no writ).

## FACTUAL BACKGROUND

Mother is the natural parent of S.M., a boy, age seven, B.M., a boy, age six, and M.M., a girl, age two. Dallas County Child Welfare (State) first became involved with the family in early January 1986, when the infant daughter was taken to Parkland Hospital with a head injury resulting from B.M.'s throwing a pressure cooker lid that hit the child in the head. A paramedic responding to the call observed that the infant daughter had an abrasion injury and that each of the boys had injuries: one a head laceration and the other an apparent nerve-damaged tooth that had turned black. Because of the nature of the injuries, the fact that all three children had some type of injury, and his uneasiness about the explanations of how they occurred, the paramedic made a referral to the State. A child abuse investigator and a caseworker for the State also observed bruises on M.M.'s head and bruises on S.M.

After Mother described various episodes of family violence, other family difficulties, and Father's drug and alcohol problems, an ongoing caseworker was assigned to assist the family. When asked how she protected herself from Father's violence, Mother stated she did so by boiling water. When the State began working with the family, they were living in a motel room. Mother explained that she and the children shared the only bed. According to her statement, Father generally was not around and if he was, he would normally sleep on the floor because he would pass out. At that time, S.M., age six, was not in school. In addition to counseling with Mother, explaining the various available services, and providing transportation in order to obtain the services, the State obtained food for the family.

Second and third referrals were made to the State in July, 1986, concerning M.M. and S.M. One referral concerned an unexplained dark blue bruise on S.M.'s neck, in the shape of a hand and a witness' observation of serious bruises on M.M.'s buttocks, legs, and vagina. The other referral concerned M.M.'s overall physical condition. Because the infant appeared to be a "failure to thrive" child and at eleven months old was unable to walk or crawl, the State assisted in getting medical attention. Further, it was noted that B.M. had not received his immunizations and S.M. was in need of serious dental work. The assigned caseworker assisted Mother in getting emergency food and in qualifying for food stamps and aid to families with dependent children (AFDC). Mother had previously been denied food stamps because she overslept and missed the appointment.

The final referral which resulted in all three children being removed from Mother's care occurred in late August 1986, when M.M. was taken to Parkland Hospital with severe second and third degree burns to her hand. The State was notified that a child had been brought into emergency, and that the mother had left the area after being questioned about how the injury occurred and after giving them an incorrect home address. Mother alleged that the

child, while pulling herself up on the couch, had put her hand in a mug of hot coffee and could not pull it out. Seven hours after the incident, Mother took the child to the hospital for treatment. Because the injury was not consistent with Mother's explanation, she was arrested, the boys were taken into protective custody, and a criminal case was filed. Mother signed a judicial confession stating that she had knowingly and intentionally engaged in conduct that caused bodily injury to M.M. by burning the child with hot water. Mother was placed on felony probation.[2]

## SUFFICIENCY OF THE EVIDENCE

In challenging the sufficiency of the evidence, Mother correctly states that in order to terminate her parental rights, there must be a finding of specific conduct under Texas Family Code section 15.02(1) as well as a finding that termination is in the best interest of each child. *See* TEX.FAM. CODE ANN. § 15.02(2) (Vernon 1986). With reference to the boys, Mother contends that there is little, if any, evidence that she engaged in conduct which endangered their physical or emotional well-being. In fact, Mother vigorously asserts that there was overwhelming evidence that the boys' physical and emotional well-being was good considering the family's economic condition in 1986. While acknowledging that she and the children were dependent upon welfare, and contributions from shelters, churches, friends and family, she states that termination is not justified. She claims that her failure to provide a desirable degree of care and support for the children was due primarily to her financial misfortune and in part to her lack of training. As to the infant daughter, Mother insists that the first three referrals were false alarms and that no injuries were found to exist. She continues to maintain that the August incident was an accident which should not form the basis for terminating her parental rights. Mother insists that she did not realize that she was entering a plea of guilty to criminal charges, but rather thought that she was signing some papers in order to obtain her release from jail.

In addition to hearing the evidence recited above, the jury heard extensive testimony concerning the volatile and chaotic nature of the marriage between Mother and Father. The first marriage ended in divorce in 1983. At that time, Mother and the two boys, ages four and three, lived primarily with the maternal grandparents. The grandparents provided the primary care and support. In March 1985, Mother and Father remarried and moved to another community to "get away from Dallas" in an attempt to work things out. The jury heard extensive testimony about a particular incident when Mother was pregnant with M.M. where she was hospitalized after one of their physical altercations. According to Mother's testimony, there were numerous arguments and often the children were caught in the cross-fire. Particular incidents involving the children related to the jury included: (1) S.M. was bruised when Father shoved him into a wall; (2) M.M. was hit with a heavy workboot, which resulted in Mother seeking help; and (3) Father threw a chair at S.M. who ducked and the chair hit B.M. Mother stated that Father was particularly violent with the children when they tried to protect her, if he was under the influence of alcohol and/or drugs.

Through Mother's testimony it is undisputed that beginning in 1985 and through August 1986, the family's place of residence changed approximately ten times, causing the children to be frequently uprooted. The period of time at each place varied from one or two days to a few months. The residences included a motel, the Salvation Army, family shelters, and the homes of friends and relatives. On at least one occasion Mother and the children stayed on the street, and on brief occasions they stayed in a car.

The jury heard a great deal about Mother's parenting skills. Sometime after the January incident with M.M. and before summer, Mother began to obtain help from a local church. At one point, she appeared

2. Injury to a child is a felony under Texas Penal Code section 22.04.

with a boyfriend and asked the church members for money so that they could pay the rent and buy some food. In mid-June, Mother appeared on the church steps seeking help because the boyfriend had "thrown them out" and they were without a place to stay. One of the witnesses became concerned when she saw a deep blue bruise on S.M. Mother explained that he probably got it playing with his friends. At least two witnesses stated that Mother was not adequately feeding M.M. because she would give her soured milk or would excessively dilute the milk with water. There was also testimony that Mother would leave the children unattended while she went to a church member's house to make telephone calls, sometimes for as long as thirty minutes to an hour. At the time the children were left unattended, they were ages five, four, and eight months. When confronted with questions about the extensive bruises on M.M., the mother explained that it occurred because the child bounced up and down on her stroller. After being confronted about the bruises, Mother did not return to the church. One of the women from the church was responsible for making the second and third referrals.

In response to the July referrals, the State arranged for the children to stay in a protective daycare facility, at no cost to Mother. The woman transporting the children during their two week enrollment in August 1986 reported that the service had to be cancelled because Mother would not have the children available on time. While this witness did not observe any bruises on the children, she reported that they were sometimes not clean and the boys would often complain of being hungry. The baby daughter was sometimes sent without diapers or milk and with dirty clothing. In addition, if Mother provided additional clothing, it was damp and had to be dried before it could be used.

The most extensive testimony concerning physical injuries concerned the infant daughter's burn. The attending physician explained why and how Mother's testimony was completely inconsistent with the nature of the injuries. He stated that the burn was due to "a forced emersion in hot liquid." As a result of the injury, M.M. was required to undergo painful skin graft surgery and extensive physical therapy. At the time of the trial, the therapy still required supervision by a responsible caretaker. He also expressed concern that Mother waited seven hours to take the child for treatment. Mother explained that she waited to go to the doctor because she was in the process of changing residences, the car was fully packed, and the injury did not appear to be that serious. Mother acknowledged that during the day she observed one or two blisters on the hand. In fact, she told the jury that she "attempted to pop them with a needle" in order to relieve the pain. However, she and her witnesses insisted that the injury did not appear to require emergency treatment. It was Mother's opinion that the bandage covering the burn caused an infection. To further explain why Mother did not think the injury was serious, she and her witnesses stated that the child did not appear to be having any pain, and in fact, was playing with the other children in the home. The jury also heard the physician's testimony that within seconds the hand would have been red: significant blisters would have formed within the hour. Due to the extent of this burn, it was the physician's testimony that the child would have been in a great deal of pain and would have been crying throughout this period. The photographs reflecting the condition of the infant's hand when she arrived at Parkland were admitted into evidence and presented to the jury. Finally, the doctor stated that although he had not seen the reported bruises on M.M.'s vagina, buttocks, and legs, he could say with medical certainty that they could not have been caused by a baby stroller.

Psychological evaluations were performed on the boys; the psychologist provided the test results and her professional opinions for the benefit of the jury. Common to both boys was that they had an unusual sense of love in that they felt that conflict, fighting, and abuse constituted proof of love. All of the test results were

consistent with their having lived in an atmosphere of chaos, violence, and instability. The psychologist reported that their levels of anxiety and anger were unusually high. The tests further indicated that a great deal more physical abuse occurred in the home than just that directed towards the infant daughter. This witness also stated that the test results demonstrated that the children's emotional needs were not being met. Finally, the jury was informed of the long term effects upon the boys. The psychologist explained why it was extremely important for them not to be returned to the prior environment and for them to continue to receive therapy.

The jury further heard from the foster father of the boys who related, without objection, that the boys stated: (1) they had never brushed their teeth before being placed outside Mother's home in August; (2) they sometimes ate cereal with roaches or other insects in it; (3) they were forced to move frequently and sometimes their possessions were sold; (4) they sometimes were forced to sleep in the car; and (5) in addition to violence by Father, Mother quite often hit them with a belt. This witness testified that the boys had scars on the front and back of their legs as a result of being hit with belts by both parents. The jury also heard about the severe dental problems being experienced by both boys. The foster parent testified that both children had teeth that were totally rotten, several teeth had to be extracted and several cavities had to be filled. Because of the lack of dental hygiene, S.M. had to have a bridge and a retainer.

The jury had the opportunity to hear Mother's testimony which included denials that there were any serious injuries to the children, other than the "accidental" burn. She also denied that M.M. had been malnourished; although, she did acknowledge that at least two physicians indicated that the child was too thin. Mother also denied that any of the children had ever had extensive bruises. The jury knew that after the August incident Mother and Father had again reconciled, and that although they had been granted the right to visit the children, they did not do so. The testimony demonstrated that the boys were placed with Mother's brother and his wife. However, Mother did not exercise any visitation because of what she called a conflict with her sister-in-law. Between August 1986 and March 1987, Mother did not see any of the children, except for running into M.M. on one occasion when Mother, Father, and the child happened to be in the same office building. The jury heard extensive testimony from the parents and the caseworkers as to the various reasons why there was no visitation. Three months before the original trial setting, Mother began to regularly visit the children.

■ Sufficient evidence exists for the jury to have affirmatively answered the jury issues. The Texas Supreme Court has defined "endanger" to mean to "expose to loss or injury; to jeopardize." *Texas Dept. of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). While endangerment means more than a threat of metaphysical injury or the possible ill effect of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Boyd,* 727 S.W.2d at 533. Other cases have held that the conduct does not have to be directed at the child or cause him physical harm, as long as the conduct was committed in the child's presence and might endanger his physical or emotional well-being. *See Stuart v. Tarrant County Child Welfare Unit,* 677 S.W.2d 273, 279 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.); *Bryant v. Hibbert,* 639 S.W.2d 718 (Tex. App.—Austin 1983, no writ); *Lane v. Jefferson County Welfare,* 564 S.W.2d 130, 132–33 (Tex.App.—Beaumont 1987, writ ref'd n.r.e.).

■ There was evidence that the boys' legs were scarred from beatings administered by Mother. As to M.M., Mother pled guilty to injury to a child, which injury required skin graft surgery and painful physical therapy. Testimony reflected that the older boy was not in school and the younger children had not received their immunizations at the time the State first received the referrals. The testimony dem-

onstrated that the children often ate poorly and in unsanitary conditions. Even though Father was violent and abusive to Mother and the children, she continued to reconcile with him, thus subjecting the children to further danger. Importantly, the boys had very distorted views of the world and their family. After considering the entire record and the cumulative weight of the evidence, we hold there was sufficient clear and convincing evidence to persuade the factfinders that the mother had engaged in conduct prohibited by section 15.02 of the Texas Family Code and that termination was in the best interest of each child. *See Holley v. Adams,* 544 S.W.2d 367, 373 (Tex.1976). We overrule points one through four.

## INEFFECTIVE ASSISTANCE OF COUNSEL AND FAILURE TO APPOINT AN ATTORNEY AD LITEM

In the fifth point of error, Mother alleges that as a matter of law she obtained ineffective assistance of counsel. She relies upon Disciplinary Rule 5–105(B), which states: "a lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under 5–105(C)." DR–105(C) states in relevant part, "a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation of the exercise of his independent professional judgment on behalf of each." SUPREME COURT OF TEXAS, RULES GOVERNING THE STATE BAR OF TEXAS, art. X, § 9 (Code of Professional Responsibility) DR 5–105(B) & (C) (1984).

The attorney in question represented Mother, Father, and the Intervenors, the maternal grandparents.[3] Mother asserts that the interests of the parties were obviously adverse, and she claims that because she was in the process of divorcing Father at the same time this cause was being tried, the attorney could not effectively render legal counsel. We disagree.

The record demonstrates that Mother was made aware of the potential conflict before the trial and she *unequivocally* agreed to the dual representation. The following, in relevant part, reflects Mother's statements at the time:

THE COURT: [Mother] do you feel comfortable letting Mr. McNees represent you and your husband on the question of termination and at the same time the grandparents on the question of custody?

MOTHER: Yes, ma'am.

THE COURT: You understand this is the time to speak up if either one of you feel like there is a conflict and that you cannot be represented; this case will have to be reset. [Father] is it your desire to go forward with Mr. McNees' representation and have this matter tried next week?.

FATHER: Yes, it is.

THE COURT: [Mother] is that your desire?

MOTHER: Yes, ma'am.

Father was not seeking the termination of Mother's parental rights. In fact, some of the most beneficial testimony for Mother's cause was elicited from Father. He stated to the jury that he thought the burn occurred exactly the way that Mother had explained it. As to the signed confession, Father defended her actions by stating that she did not know what she was signing. Furthermore, he testified that if their parental rights were not terminated, and they went forward with the divorce, he would be satisfied with Mother "having custody" if he could have visitation rights. There is no showing that the interests of Mother and Father were adverse to one another as to the issues involved in the termination of Mother's parental rights. In fact, they appear to be anything but discordant, inconsistent, or diverse. *See Lott v. Ayres,* 611 S.W.2d 473, 476 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.). The divorce action was severed from the termination proceeding, another fact that reduced the potential for conflict. The Intervenors' request for conservatorship was conditional, and first

---

**3.** The maternal grandparents have not appealed     from the adverse judgment against them.

asked that the children be awarded to Mother, which further minimized any potential conflict. Further, Mother agreed to the dual representation stating that she felt comfortable with the attorney representing her and Father. She was admonished to speak out if she felt there was a conflict. "A defendant who raises no objection at trial must demonstrate that an actual conflict of interest adversely affected his attorney's performance." *DeLeon v. State,* 657 S.W.2d 160, 164 (Tex.App.—San Antonio 1983, no pet.). In one case where a father was represented by one attorney on divorce and the same attorney represented both parents in a termination cause, the court said:

> An attorney is not precluded from representing multiple clients in a suit unless the client's interests are actually "adverse and hostile." A mere potential conflict of interest is insufficient to prohibit multiple representation as long as there is no real and substantial conflict.

*In re H.W.E.,* 613 S.W.2d 71, 72 (Tex.Civ. App.—Fort Worth 1981, no writ). We do not find an actual conflict of interest in this case.

In the sixth and final point of error, Mother claims that section 11.10(d) of the Texas Family Code required the trial court to appoint an attorney ad litem to represent her.[4] We disagree. The record does not reflect that Mother was indigent, in fact her testimony demonstrated that she was earning $200 per week while living at home. Furthermore, Mother did not request appointed counsel and in fact was represented by retained counsel throughout the proceedings. The trial court did not err in failing to appoint an attorney ad litem *sua sponte.* Points five and six are overruled.

We affirm the trial court's judgment.

---

**4.** Section 11.10(d) of the Texas Family Code provides that in any suit brought by a governmental entity seeking termination of the parent-child relationship, the court shall appoint an attorney ad litem to represent the interests of an *indigent* parent of the child who opposes the termination.