In the Interest of M.D., a child
















IN THE
TENTH COURT OF APPEALS
 

No. 10-97-268-CV
 
IN THE INTEREST OF M.D., A CHILD
 
 

From the 361st District Court
Brazos County, Texas
Trial Court # 7826-361
                                                                                                                

O P I N I O N
                                                                                                                

      Beth Bailey gave birth to M.D. on March 8, 1996. The Texas Department of Protective and
Regulatory Services (DPRS) filed a suit affecting the parent-child relationship on March 19,
seeking to terminate Bailey’s parental rights. Trial was held on July 1, 1997, and the court
entered judgment in favor of DPRS. We will affirm the judgment.
FACTS
      When M.D. was born, Bailey was living at the Casa Loma Motel in Bryan with the father of
the child, Guadalupe Duran. One night when M.D. was just a week old, Bailey took her to a bar
where Debra Blaisdale asked about the possibility of adopting M.D. Apparently, Bailey had been
acquainted with Blaisdale for about three years. Bailey, concerned about Duran’s lack of desire
to be a father, gave Blaisdale the child and a slip of paper which said she could adopt the child. 
Blaisdale took M.D. to Corpus Christi. Some time later, Bailey called the police, stating that
Blaisdale was supposed to have returned M.D. and had not. After the police located the child in
Corpus, Child Protective Services (CPS) took custody of her. Duran signed an affidavit
relinquishing his parental rights. M.D. remained in CPS custody until she went into foster care,
where she remains. 
POINTS OF ERROR
      Bailey presents two issues alleging that the evidence is legally and factually insufficient to
support the court’s decision to terminate her rights. She argues that there was no more than a
scintilla of evidence presented to support findings that she:
      1)   engaged in conduct or knowingly placed the child with persons who engaged in conduct
which endangered the physical or emotional well-being of the child;
 
      2)   knowingly placed or knowingly allowed the child to remain in conditions or surroundings
which endangered the physical or emotional well-being of the child;
 
      3)   failed to support the child in accordance with her ability for a period of one year ending
within six months of the date of the filing of the petition;
 
      4)   voluntarily left the child alone or in the possession of another without providing adequate
support of the child and remained away for a period of at least six months;
 
      5)   constructively abandoned the child who has been, or at the time of trial will have been,
in the permanent or temporary managing conservatorship of the Department of Protective
and Regulatory Services or an authorized agency for not less than one year, and: the
department had made reasonable efforts to return the child to the parent; and the parent
has not visited or maintained contact with the child; and the parent has demonstrated an
inability to provide the child with a safe environment; and;
 
      6)   executed an irrevocable affidavit of relinquishment of parental rights under Section
161.103 of the Texas Family Code.

Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 1998). The court determined that it was in
M.D.’s best interest to terminate Bailey’s rights based upon the fact that “she engaged in conduct
or knowingly placed the child with persons who engaged in conduct which endangered” her
physical and emotional well-being. Id. 161.001(1)(E). We will review the evidence for legal and
factual sufficiency on this ground.



SUFFICIENCY OF THE EVIDENCE
Standards Of Review
      The involuntary termination of parental rights involves fundamental constitutional rights. 
Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). It is a remedy of such
weight and gravity that due process requires termination to be justified by “clear and convincing
evidence.” In re G.M., 596 S.W.2d 846, 847 (Tex. 1980); Spangler v. Texas Dept. Protective
and Regulatory Services, No. 10-97-210-CV, slip. op. at 3 (Tex. App.—Waco, February 4, 1998,
n.w.h.). This trial standard is defined as “that measure or degree of proof which will produce in
the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to
be established.” Id.
      In considering a legal-sufficiency issue on appeal, we use the customary standard of review. 
We consider only the evidence which tends to support the jury’s findings and disregard all
evidence and inferences to the contrary. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965);
Lucas v. Texas Dept. Of Protective and Regulatory Services, 949 S.W.2d 500 (Tex. App.—Waco
1997, writ denied); Worcham Steel Co. v. Arias, 831 S.W.2d 81, 83 (Tex. App.—El Paso 1992,
no writ). If any probative evidence supports the jury’s determination, it must be upheld. In re
King’s Estate, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951); Lucas, 949 S.W.2d at 502. 
      As to the standard of review applied to factual-sufficiency challenges at the appellate level,
we have determined that when the trier of fact is required to make a finding by clear and
convincing evidence, we will sustain a point of error alleging factually-insufficient evidence if the
trier of fact could not reasonably have found the existence of the fact to be established by clear and
convincing evidence. Spangler, slip op. at 5.


 We have determined that this intermediate standard
of review is necessary to protect the fundamental constitutional rights involved in a termination
suit. Id. It is our duty to determine whether the trier of fact could reasonably conclude that the
existence of a fact is highly probable.


 Id. at 4; Neiswander v. Bailey, 645 S.W.2d 835, 836 (Tex.
App.—Dallas 1982, no writ). Under this standard, we must consider whether the evidence was
sufficient to produce in the mind of the factfinder a firm belief or conviction as to the truth of the
allegations sought to be established. Mezick v. State, 920 S.W.2d 427, 430 (Tex. App.—Houston
[1st Dist.] 1996, no writ).
Grounds For Involuntary Termination
      Before parental rights are terminated, the evidence must establish (1) one of the statutory
grounds for termination, and (2) termination is in the child’s best interest. See Tex. Fam. Code
Ann. § 161.001 (Vernon Supp 1998); Interest of R.D., 1997 WL 586425 (Tex. App.—San
Antonio 1997, n.w.h.).
      The statutory ground under which the court found evidence to terminate is subsection E of
Section 161.001(1). Subsection E requires that the parent’s conduct be the direct cause of the
endangerment, as evidenced by both the parent’s acts and omissions. In re H.C., 942 S.W.2d
661, 664 (Tex. App.—San Antonio 1997, no writ); Director of Dallas County Child Protective
Services v. Bowling, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no writ). If the evidence
shows a course of conduct “which has the effect of endangering the physical or emotional well-being” of the child, then a finding under subsection E will be upheld. Spangler, slip op. at 11;
Texas Department of Human Services v. Boyd, 727 S.W.2d 531, 534 (Tex. 1987).
The Findings
      The court found by clear and convincing evidence that termination was supported by Section
161.001(1)(E) and that termination was in M.D.’s best interest. In making this determination, the
court properly considered what Bailey did both before and after M.D. was born, whether the
conduct was directed at her, and whether or not actual harm resulted to her. Interest of C.D., 664
S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ). Because the record contains testimony
from only two witnesses, we will detail the testimony in its entirety and then apply the standards
of review.
The Evidence
      Bailey testified that she is an alcoholic. She testified that she had been in jail for public
intoxication too many times in the past year to estimate what percentage of time she had spent in
jail. At the time of trial she was in jail. She testified that several caseworkers tried to arrange for
treatment for her alcoholism, but she did not participate. She stated that she and Duran both drank
a lot, and most of the people they knew were alcoholics. Up to the time of trial, Bailey stated,
unless she was in jail, she never had less than a quart of beer to drink on a particular day. She
stated that she could quit drinking for M.D., although she had not stopped when CPS workers told
her it was necessary before M.D. could be returned to her. 
      Bailey testified that she drank during her pregnancy with M.D. Her explanation was that she
did not realize she was pregnant until she was five months along. She stated that until she found
out she was pregnant she would drink approximately 10 quarts of beer per day, but that she “cut
back” to three quarts a day once she found out she was pregnant. On cross-examination, she
stated that she might have been arrested for public intoxication during the last months of her
pregnancy, but that it would not necessarily indicate she had been drinking excessively because
the officers knew she was an alcoholic and always assumed she had been drinking. She explained
that she could not quit totally once she found out she was pregnant “because the baby was used
to it.” M.D. was born with fetal alcohol syndrome. 
      Bailey testified that during M.D.’s first week of life, she took her everywhere, including bars,
but that she “never got intoxicated to the point where she was ever physically abused.” She stated
that after M.D. was born, Duran started coming in late, and it upset her. She said that Blaisdale
asked to adopt M.D., and although she had been drinking and could not remember exactly what
she told her, she was sure that she only gave M.D. to her “temporarily.” She did give Blaisdale
a sheet of paper that said she could adopt M.D., but she explained that it was just to show to
Duran to gauge his reaction. 
      Bailey testified that they “had it planned where [Blaisdale] was going to act like she had
forgotten something and come back around the time that [Duran] would be there. . . . [Bailey]
was going to show [Duran] the paper and make him really, really think that [Bailey] had let
[Blaisdale] have [M.D.]” She admitted that she “went a little too far,” and that she “might have
lied to [Blaisdale] and told her and made her believe she could have” the child. However, at trial
she insisted that she only intended for Blaisdale to take the child temporarily because she knew that
the piece of paper stating that Blaisdale could adopt M.D. would not be a “serious document”
without a judge’s signature. 
      Bailey testified that Blaisdale was a “sweet girl” and that there was just some confusion
because Blaisdale thought she was serious about the adoption. She stated that she was “shocked”
to discover that Blaisdale had stolen a car to go to Corpus Christi, because she did not think she
was the type of person to steal. 
      Bailey testified that she had brain damage due to an accident that occurred around 1990 or
1991. She had difficulty remembering when and if things had happened. When asked about how
old M.D. was when Blaisdale took her, Bailey said about three weeks old, although she was
actually barely over one week old. She could not remember how many times she had been in jail,
or even whether she had been in jail while she was pregnant. 
      Bailey testified that she visited M.D. only three times during the year between removal and
the trial because she felt like it would only hurt to see her. She testified that she knew she needed
to go to parenting classes, but that she only attended one class because her “cab driver” was
retiring and Duran would get angry if she rode with anyone else. She stated that she was not used
to trolleys and buses, so she did not want to take one, even though CPS paid for it. Bailey stated
that when she gets out of jail, she intends to live with a close friend, Ann Marie Thompson, her
husband and two kids in their trailer. She stated that she met Thompson in jail, and that almost
always when she is arrested, she shares a cell with Thompson. She testified that she really did not
know much about Thompson, except that she had never heard that she was a “crack head.” Bailey
stated that her plans for the future included trying to “make it as a family without drinking.” She
testified that she planned to move to North Carolina, hopefully with Duran, to raise M.D. She
testified that she wanted Duran to be a “father figure” for M.D., although he is physically abusive
and had “left some bruises” on her arm only two weeks before trial. Bailey admitted that the way
she had been living was dangerous for M.D. and that she should not raise her in that manner.
      Cara Charanza, a caseworker for CPS, testified that Bailey had the opportunity to visit M.D.
sixty times during the period of time that she was in CPS’ custody. She stated that Bailey actually
made four visits, one of which included taking M.D. to the jail. Charanza testified that, on one
occasion, Bailey showed up at the CPS office intoxicated and the police had to escort her out. She
stated that one other time Bailey showed up thirty minutes after the visiting time ended. Charanza
stated that she observed the visits and often saw Bailey get angry at the child because M.D. would
look at her father more than at Bailey, and Bailey felt that she loved her father more. She said that
Bailey made several references to the fact that M.D. looked like Duran and that she was mad at
her for it. This was further emphasized by Bailey herself when she stated that she was “real
upset” when M.D. was born because her hair was black. She stated that she wanted M.D. to take
after her, but that she did forgive her for not looking like her. Charanza testified that Bailey had
a lot of inappropriate expectations for M.D. considering her young age. For example, she became
angry with her when she dropped her pacifier and when she attempted to suck her thumb. 
      Charanza testified that CPS considered placing M.D. with Duran’s sister, but when it was
mentioned to Bailey, she stated that she would kill his sister before she would let her take M.D. 
Charanza stated that Bailey would call while she was in jail and say, “I’ll do whatever it takes,”
but as soon as she would get out of jail, they would not hear from her again until the next time she
was placed in jail. Charanza testified that Bailey never followed through with any plans which
were necessary before M.D. could be returned to her. She did not show up for appointments with
the Brazos Valley Council on Alcoholic and Substance Abuse, nor would she see a psychologist
or attend the parenting classes. She also could not stay sober and out of jail long enough to find
a permanent home and stable income. 
CONCLUSION
      Texas Dept. Of Human Services v. Boyd states that endangering the child means to “expose
to loss or injury; to jeopardize.” 727 S.W.2d at 533. Bailey took M.D. to a bar, drank large
amounts of alcohol both while pregnant and while caring for the child, placed her in a woman’s
custody whom she knew little more about than that she was living in the same motel, and visited
her only four times over an entire year once CPS took custody. She spent more time in jail than
out in the time since M.D. was born until trial and, although she stated that she could change for
M.D., she made no serious attempts to do so.
      We find that the evidence is legally sufficient to support a finding that Bailey knowingly
engaged in conduct or placed M.D. with a person who engaged in conduct that endangered her
well-being. See Sylvia M. v. Dept. Of Human Services, 771 S.W.2d 198, 200 (Tex.
App.—Dallas 1989, no writ). Further, considering all the evidence, the court could reasonably
have found by clear and convincing evidence that Bailey engaged in a course of conduct which had
the effect of endangering the physical and emotional well-being of M.D. Id.
      Having applied the appropriate standards of review to the legal and factual sufficiency issues
presented and having found the evidence sufficient to produce in the mind of the factfinder a firm
belief as to the truth of the allegations, we overrule issues one and two. The judgment is affirmed.
 
                                                                                     BILL VANCE
                                                                                     Justice

Before Chief Justice Davis,
      Justice Cummings, and
      Justice Vance
Affirmed
Opinion delivered and filed April 16, 1998
Do Not Publish