Sharon BAKER and Darryl Cole,
Appellants–Respondents,

v.

MARION COUNTY OFFICE OF
FAMILY AND CHILDREN,
Appellee–Petitioner,

and

Child Advocates, Inc., Co–Appellee–
Guardian Ad Litem.

No. 49A02–0105–JV–299.

Court of Appeals of Indiana.

May 30, 2002.

Katherine A. Cornelius, Indianapolis, IN, Attorney for Appellants.

DeDe Connor, Marion County Office of Family & Children, Loretta Oleksy, Child Advocates, Inc., Indianapolis, IN, Attorneys for Appellees.

### OPINION

MATHIAS, Judge.

Sharon Baker ("Mother") and Darryl Cole ("Father") appeal the Marion Superior Court's order terminating their parental rights to their child, D.C.[1] Mother and

---

1. Father had three other children, not including D.C., of which he did not have custody and for which he did not pay child support. Tr. pp. 44–48. Mother had six other children, not including D.C., of which she did not have custody and for which she did not pay child support. Tr. pp. 92–105. Mother testified

Father argue that a prohibited conflict of interest arose based upon their joint representation by appointed counsel and that neither Mother nor Father validly consented to a waiver of the conflict.[2] Because we find the issue of whether there was a prohibited conflict of interest dispositive, we do not reach the waiver issue.

We affirm.

### Facts and Procedural History

The facts most favorable to the trial court's judgment reveal that on August 8, 1998, Mother prematurely delivered D.C., a baby girl. Mother admitted that during the pregnancy and just days before delivery, she had used cocaine. Due to medical concerns, D.C. remained in the hospital for approximately three weeks. D.C. was in an emergency shelter care home from the end of August 1998 until the end of October 1998. D.C. was then placed in foster care in a potential pre-adoptive home. Tr. p. 144. D.C. has never lived with Mother or Father.

On August 18, 1998, the Marion County Office of Family and Children ("the MCOFC") filed a Petition Alleging Child in Need of Services on behalf of D.C. Ex. Vol. I, p. 6. Mother and Father each admitted that D.C. was a child in need of services in writing and in open court. Ex. Vol. I, p. 10; Tr. pp. 53–54, 119–20. On September 17, 1998, the trial court held a disposition hearing, at which Father appeared, but Mother did not. The court found that it was in the best interests of D.C. to be placed outside of the home at that time because services that were offered to Mother and Father, in an attempt to have D.C. returned to the home, were either not completed or not effective. Ex. Vol. I, p. 14. At that time, the court ordered Mother and Father into a social services program entitled Parental Participation.

Under Parental Participation, Mother and Father were required to maintain current information with their caseworker, meet with their caseworker weekly, maintain a legal and stable income, obtain and maintain suitable housing with adequate bedding, participate in and successfully complete home-based counseling, complete a parenting assessment and successfully complete any programs recommended pursuant to the parenting assessment results, complete a psychological evaluation, participate in and successfully complete a drug and alcohol assessment and any programs recommended pursuant to the assessment, and lastly, visit D.C. regularly and cooperate with the supervision of D.C. Ex. Vol. I, pp. 15–17.

Dianne Reach ("Reach"), the family's case manager from the MCOFC, began working on D.C.'s case in August 1998. After the initial CHINS hearing in August 1998 and the disposition hearing in September 1998, which outlined the requirements Mother and Father would have to meet in order to obtain custody of D.C., Reach spoke with both parents about the services and sent letters to Mother and Father, detailing what they needed to do and who they needed to contact to make appointments. Tr. p. 143. Reach clearly wrote in the letters that any programs recommended by any of the agencies providing assessments and services should be completed by the next hearing date, which was set for December 15, 1998. Ex. Vol. I, pp. 19–23.

Reach testified that Father completed his drug and alcohol evaluation but failed to follow through with recommendations for treatment. Mother failed to keep her

that she had lost her parental rights to all six of the children. *Id.*

**2.** Ironically, Mother and Father are jointly represented on this appeal.

appointments for her drug and alcohol evaluation. Both parents participated in the first portion of parenting assessment, but both failed to complete the bonding portion of the assessment because they both failed to keep their visitation appointment. Tr. p. 144. Additionally, both parents were given a list of six different agencies in their area to choose among for parenting classes, and as of the fall 1998, neither parent reported that they had completed parenting classes.

Throughout the fall of 1998, both parents failed to maintain consistent visitation with D.C. When D.C. was in the emergency shelter care home, the foster parents were able to supervise visitations. When Mother and Father complained of transportation problems, Reach sent bus tickets to them, and the foster parents even offered to meet Mother and Father half-way. Mother and Father still failed to visit regularly. After D.C. was moved at the end of October 1998, visitation was established through at least two different visiting centers, wherein the foster parents did not supervise the visits. However, visitation by Mother and Father continued to be inconsistent. At one of the visiting centers, Father and Mother both had thirteen scheduled visits, but only appeared at four. Tr. pp. 60–61, 134–35.

A court date was set for January 1999, but neither parent appeared. Mother had been arrested in Tippecanoe County, and was incarcerated there. She was then transported to the Women's State Prison. Throughout Mother's incarceration she regularly mailed letters to Reach, and mailed letters and cards to Reach for D.C. Tr. p. 146. Until April 1999, the MCOFC's plan for D.C. was reunification with Mother and Father; however, in April, the plan for D.C. changed from reunification to adoption. The Petition to Terminate Parental Rights was then filed against Mother and Father on April 19, 1999. Then in May 1999, D.C. was removed from her foster home and placed with her paternal grandmother.

From January 1999 through October 1999, Mother was in the Women's Prison. D.C. was taken to the prison for visits with Mother, and Mother completed parenting classes while incarcerated. Nevertheless, Mother's visitation with D.C. subsided upon her release from prison. Reach again made new referrals for Mother and Father in October 1999. Tr. p. 149. Mother received referrals for drug and alcohol evaluations and for supervised visitations with D.C. at a visiting agency. Mother failed to follow through with any of these referrals, and her lack of consistent visits with D.C. resulted in cancellation of the services. Father also failed to follow through on his new referrals.

Reach testified that neither Mother nor Father completed all of the services required by their Participation Decree established by the juvenile court. Further, Reach testified that neither parent maintained constant contact with her; both had periods when they would lose touch with Reach, but that both always eventually recontacted her. Tr. p. 150. Reach had contact with Father the day before the January 18, 2001 termination hearing, but had not had any contact with Mother for several months.

Lance Brown ("Brown"), an addictions counselor at Community Addiction Services of Indiana (CASI), conducted a drug and alcohol assessment on Mother in August of 2000, upon referral of Mother to CASI by MCOFC. Tr. pp. 14, 16. Mother told Brown that she had used cocaine about two to four times per week for the last four years, and that she also used marijuana and alcohol, but not to the extent of her cocaine use. Tr. p. 14. Mother informed Brown that she suffered from and received medication for depression

and epileptic seizures, and that she suffered from a partial paralysis in her left hand as a result of a drive-by shooting. Tr. p. 16. Brown's recommendation for Mother was dual diagnosis treatment for depression and cocaine dependency at a mental health center. Brown testified that Mother's depression should be treated as the primary diagnosis, and the cocaine abuse should be treated as a secondary diagnosis. Tr. p. 17. Brown also testified that he would "have serious concerns with any child being in the custody of a not treated chemically dependent person." Tr. p. 19.

With regard to Father, Brown testified that Father failed to appear for at least two scheduled assessments: one in July 1999, the other in November 2000. Father himself arranged the July 1999 appointment, but the November 2000 assessment was on reference from MCOFC. Tr. p. 20.

The MCOFC recommended that Mother's and Father's parental rights with regard to D.C. be terminated because they failed to complete services that would prepare them to be parents to D.C. Reach testified that both Mother and Father had expressed the desire to care for D.C., but neither demonstrated their cooperation with treatment or their ability to care for D.C. Mother and Father were first given referrals for evaluations and treatment services in August 1998, but two and one-half years later, in January 2001, Reach testified that she believed it would be harmful to D.C. to be returned to her parents based upon Mother and Father's instability, inconsistent visitations, and continued chemical addictions. Tr. p. 152. At the termination hearing, the MCOFC's plan for D.C. was adoption, and Reach testified that pre-adoptive homes had already been identified.

Mother and Father both testified at the termination hearing. Father testified that he stayed with different people throughout the week and that he did not have a residence of his own, nor had he ever rented an apartment for a year or longer or owned a home. Father explained that the reason he had difficulty completing the required services was due to transportation problems and periodic incarceration. Tr. p. 69. And, even though he testified that he was doing landscape work and work through a temporary service, he also testified that he would be entering an inpatient treatment program for his alcoholism the week following the termination hearing. He said the program would last at least three months. Tr. p. 50. When asked what he had done to prepare for D.C. to come live with him, Father said, "I'm staying from here to there. I'm getting ready to go to in-patient. Now I can't prepare her no place right now. If I don't have no place. And I'm going in to in-patient.... She can still stay in foster care with my mother. But I can't have her returned to me right now." Tr. p. 66.

Mother, who at the time of the termination hearing was incarcerated at the Marion County Jail for violating her probation, testified that her reasons for failing to complete any treatment services were because she had transportation problems and because the referred agencies would only give her out-patient treatment when she claimed to know that she needed inpatient treatment for her depression and cocaine addiction. Tr. p. 129. Mother also testified that the last time she was employed was in 1996. Tr. p. 85. She stated that she believed she was fired because of her partially paralyzed left hand, but that the employer informed her it was because she was late too often. Tr. p. 86. Mother's only plan for obtaining income after her release from jail was to get in contact with her attorney and attempt to get social security disability benefits.

Mother testified about her seven children, including D.C., and admitted that her parental rights to all of them except D.C. had been terminated. At the time of the final hearing, five of Mother's seven children lived in Minnesota, and Mother testified that she had not visited those children for at least two and one-half years. Tr. p. 101. Mother testified that she began seeking prenatal care during her pregnancy with D.C. after she realized she was pregnant, which was not until her pregnancy was three to four months along. Tr. p. 109. Mother testified that within two days before she prematurely went into labor with D.C. she smoked about $40–$50 worth of cocaine. When asked whether she believed her cocaine addiction affected her ability to parent D.C., Mother stated, "I can't help nobody right now. I'm trying to help myself.... I love [D.C.] in all kinds of ways. But, I can't be that parent to [D.C.] right now until I get help for me." Tr. p. 132.

Mother also admitted that her missed visitations while D.C. was in foster care were not just due to transportation problems, but also because she was using drugs instead of making her visitation appointments. Tr. p. 135. Mother lastly testified that she could be a parent to D.C. if she were given the right help for her drug addiction. She said that after her release from jail, she planned to enter a new drug addiction program. Also, when asked whether or not D.C. should wait until Mother is clean for her to be a parent, Mother responded, "I'm not—I don't know what you all are planning on doing, making [D.C.] wait. And my baby don't [sic] deserve to keep on waiting for me. But I don't want her to be with no one else." Tr. pp. 137–38.

During the CHINS and involuntary termination proceedings, neither Mother nor Father had consistent representation. At the April 20, 1999 initial hearing, neither Mother nor Father appeared. Nevertheless, Cheryl S. Boone ("attorney Boone"), a public defender, was present, but the record is unclear on whose behalf she appeared. Appellants' App. p. 25. On May 13, 1999, the date of Mother's initial hearing, (because she was not transported from the Indiana Women's Prison to the April 20 hearing), mother was represented by Patricia L. McKinnon ("attorney McKinnon"), a public defender. Appellants' App. p. 28. On December 23, 1999, a Notice of Substitution of Counsel was filed on Mother's behalf. Attorney Trina Saunders Ray ("attorney Ray") was substituted for attorney McKinnon. On February 23, 2000, the MCOFC filed a Second Praecipe for Continued Initial Hearing because Father did not appear for the initial hearing on May 13, 1999 or the pre-trial conference on September 20, 1999. Father was served with a summons on March 18, 2000, informing him of a hearing scheduled for March 20, 2000. After several continuances, the final hearing was eventually held on January 18, 2001.

Attorney Ray, Mother's counsel until approximately September 2000, filed a Motion to Withdraw Appearance on September 20, 2000, based on the fact that Mother had made no contact with attorney Ray since April 2, 2000, even though Ray attempted to contact Mother. Appellants' App. pp. 61–64. Also, the Record does not indicate that Father ever had counsel until September 28, 2000, when the Record shows that Thomas D. Strodtman ("attorney Strodtman") began representation of Father. At the final hearing on January 18, 2001, the following colloquy took place:

THE COURT: ... Mr. Strodtman, are you going to be representing both [Mother] and [Father]?

MR. STRODTMAN: Yes, Your Honor. My opinion is that I don't have any hearing conflict in this matter. I've dis-

cussed the matter with both of the parties, and they agreed that I can represent them fairly. There's no situation here that we see where Mom or Dad would be blaming each other for the allegations that have been alleged by the Office of Family and Children. So, I think, in good faith I can go forward; and both parents have consented.

THE COURT: ... Now [Mother] and [Father], you have discussed this matter with your attorney?

[FATHER]: Yes, ma'am.

THE COURT: [Mother]?

[MOTHER]: Yes, ma'am.

THE COURT: And is that how you care to proceed is with Mr. Strodtman representing you?

[MOTHER]: Um-hum (affirmative response). Well, see, he already told me it wouldn't really matter.

THE COURT: My question was whether that's how you wanted to proceed?

[MOTHER]: Yes, ma'am.

THE COURT: Okay. Your prior counsel withdrew, you're aware of that, is that right, ma'am?

[MOTHER]: Yes.

Tr. pp. 4–5.

The trial court terminated both Mother's and Father's parental rights in its order dated February 23, 2001. On March 16, 2001, attorney Strodtman filed a motion to withdraw his appearance and requested the appointment of counsel from the public defenders' appellate division, which was granted March 19. Appellants' App. pp. 93–94. Mother and Father now appeal.[3]

### Discussion and Decision

◼ Mother and Father argue that attorney Strodtman's joint representation of them at their termination hearing created an impermissible conflict of interest. Whether a single attorney may represent both parents in a termination proceeding is a case of first impression in Indiana. Although Indiana courts have not before determined whether it is an impermissible conflict of interest for one attorney to jointly represent two parents in a termination proceeding, our courts have addressed conflict of interest issues under similar circumstances, and other state courts have addressed this exact issue.

We start our analysis with reference to the conflict of interest resolution structure contained in the Indiana Rules of Professional Conduct. Indiana Rule of Professional Conduct 1.7 reads:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

 (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

 (2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

 (1) the lawyer reasonably believes the representation will not be adversely affected; and

 (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common repre-

---

**3.** We note that our court received this appeal on April 2, 2002, even though the Appellants' Brief was filed on July 30, 2001, and the Appellee's Brief was filed on September 4, 2001. A reply brief was not filed.

sentation and the advantages and risks involved.

In the present case, the record shows that attorney Strodtman complied with the requirements of Rule 1.7(a) when he explained that Mother and Father did not have interests directly adverse to each other:

> THE COURT: ... Mr. Strodtman, are you going to be representing both [Mother] and [Father]?
>
> MR. STRODTMAN: Yes, Your Honor. My opinion is that I don't have any hearing conflict in this matter. I've discussed the matter with both of the parties, and they agreed that I can represent them fairly. There's no situation here that we see where Mom or Dad would be blaming each other for the allegations that have been alleged by the Office of Family and Children. So, I think, in good faith I can go forward; and both parents have consented.

Tr. p. 4.

 Yet, Appellants claim that even an *apparent* conflict of interest in a termination proceeding should constitute reversible error. We disagree. We hold that conflict of interest claims in termination proceedings should be considered and resolved in the same manner as claims of ineffective assistance of counsel in criminal proceedings. Under that analysis, for an attorney's conflict of interest to constitute reversible error in a proceeding for the termination of parental rights, an allegedly aggrieved parent must show an *actual* conflict of interest that existed at the time of the proceeding in question. *See Whittle v. State,* 542 N.E.2d 981, 987 (Ind.1989). An actual conflict refers to competing interests between jointly represented parties. *Tate v. State,* 515 N.E.2d 1145, 1147 (Ind. Ct.App.1987). The appropriate viewpoint is the relationship between the two clients, not what counsel has or has not done. *Id.* There must be a showing that the jointly represented parties have interests inconsistent to each other; that evidence that helped one party could hurt the other. *Id.* at 1147 n. 6 (citing *Bean v. State,* 460 N.E.2d 936, 946 (Ind.1984)).

In *In re J.T.,* 740 N.E.2d 1261 (Ind.Ct. App.2000), *trans. denied,* a panel of this court was presented with the issue of whether Appellant's counsel was ineffective at Appellant's parental rights termination hearing. The *J.T.* court determined that termination decrees "work a distinctive type of deprivation, 'among the most severe forms of state action.'" *Id.* (quoting *M.L.B. v. S.L.J.,* 519 U.S. 102, 128, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996)). Because "termination proceedings have been deemed 'comparable to criminal proceedings' in some respects[,]" *id.* (quoting *In re D.L.M.,* 725 N.E.2d 981, 983 (Ind.Ct.App. 2000)), the court adopted the standard for ineffective assistance of counsel in criminal cases, for use in termination cases.[4]

This standard is consistent with that employed by other jurisdictions. In *In re Jessica F.,* 126 N.M. 664, 974 P.2d 158, 162 (Ct.App.1998), on appeal from a termination decree, Mother argued that her trial counsel's joint representation of her and

---

4. The *J.T.* court cited *In re D.T.,* 547 N.E.2d 278 (Ind.Ct.App.1989), *trans. denied,* in which a panel of this court considered a claim of ineffective assistance of counsel in a termination proceeding and "assumed" that the standard used to evaluate ineffective assistance of counsel claims in criminal cases was appropriate. *In re J.T.,* 740 N.E.2d at 1265. The *J.T.* court also cited *State ex rel. Children,* *Youth & Families Dep't v. Vanessa C.,* 128 N.M. 701, 997 P.2d 833, 841 (Ct.App.2000), *cert. denied,* 128 N.M. 690, 997 P.2d 822 (2000), in which the New Mexico Court of Appeals found that a majority of jurisdictions utilize the criminal standard to evaluate ineffective assistance of counsel claims in termination proceedings. *In re J.T.,* 740 N.E.2d at 1265.

Father at their final hearing created a conflict of interest. The New Mexico Court of Appeals determined that because it had previously utilized the criminal standard for purposes of evaluating ineffective assistance of counsel claims in termination proceedings, it should apply the criminal standard to the conflict of interest issue as well. *Id.* at 162. The court went on to conclude that "[t]he test for determining the existence of an actual conflict is whether counsel 'actively represented conflicting interests' that adversely affected his performance." *Id.* (quoting *State v. Santillanes*, 109 N.M. 781, 790 P.2d 1062, 1064 (Ct.App.1990) (citation omitted)).

Texas courts have also utilized a criminal standard for analyzing possible conflicts of interest when parents are jointly represented at termination proceedings. The *In re B.L.D.* court, quoting a Texas criminal case, concluded that "[a]n actual and significant conflict of interest of the degree requiring reversal exists when 'one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also representing.'" *In re B.L.D.*, 56 S.W.3d 203, 213 (Tex.App.2001) (citations omitted). The court concluded that when counsel "struggle[s] to serve two masters[,]" a finding of ineffective assistance of counsel based upon a conflict of interest should naturally follow. *Id.* (citations omitted). In this case, the court found a conflict of interest where parents were jointly represented at their termination hearing, and counsel "straddled the fence" by stating in closing argument that Mother and Father were not legally a team, and reminding the jury that Mother testified that she would leave Father if his rights were terminated but hers were not. *Id.* at 214. The court found that counsel's "hands were tied from strongly advocating in favor of either [Mother] or [Father] and against the other." *Id.; see also Sylvia M. v. Dallas County Child Welfare Unit of the Tex. Dep't of Human Servs.,* 771 S.W.2d 198 (Tex.Civ.App.1989).

Our case is dissimilar to *In re B.L.D.*, 56 S.W.3d at 214, where joint counsel reminded the jury during closing that Mother testified that she would leave Father if his rights were terminated and hers were not. Our case is also not of the offending type suggested by the Texas Court of Appeals in *Sylvia M.*, 771 S.W.2d at 204, wherein one of the parents seeks termination of the other parent's rights. Here, Mother's and Father's interests in this case are allegedly to retain parental rights over D.C., although neither parent has worked toward that goal in the more than two years D.C. has been out of their custody. Neither parent has blamed the other for the loss of custody. Even on appeal joint counsel can point to nothing concrete that shows that Mother's and Father's interests were "adverse and hostile." *See id.* at 205. Appellants' counsel only points out that the termination hearing record includes evidence that "could have" caused divergent interests between Mother and Father. Br. of Appellants at 16–18.

Appellants' counsel also discusses at length the things that MCOFC allegedly did or did not do that might have caused Mother and Father not to get treatment, to miss visitation, and to possibly compromise their competence to testify at the termination hearing. Br. of Appellants at 18–23. Appellants' counsel points to the different treatments and services needed by Mother (for cocaine addiction and depression), and by Father (for alcoholism), and states that these differences, by themselves, create a conflict. However, the record is also replete with evidence of nearly total indifference toward reunification requirements and services by Mother and Father.

Because Mother and Father were allegedly focused on the same goal of preventing an involuntary termination of their parental rights over D.C., and because neither parent sought to present evidence or argue contrary to the other's interests, we conclude that Mother's and Father's interests were not divergent, and that under the facts and circumstances of this case, no prohibited conflict of interest existed in attorney Strodtman's joint representation of Mother and Father at the termination hearing.

Affirmed.

BARNES, J., and KIRSCH, J., concur.