# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00377-CV

**N. A. B. and A. D. J., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. D-1-FM-13-003295, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from a final decree, based on jury findings, terminating the parental rights of a mother, N.A.B., and father, A.D.J., to their infant child, N.B. Each appellant challenges the legal and factual sufficiency of the evidence supporting three alternative statutory termination grounds that were submitted to the jury.[1] We will affirm the termination decree.

## BACKGROUND

At the termination hearing, the jury heard evidence tending to show that, among other things, A.D.J. was a drug user and had engaged in multiple acts of domestic violence against N.A.B.,

---

[1] N.A.B. and A.D.J. are represented by different attorneys and have submitted separate briefs on appeal. Although they organize their arguments differently, with N.A.B. asserting three issues and A.D.J. consolidating his arguments into a single issue, they assert essentially the same challenges to the sufficiency of the evidence supporting the three alternative statutory termination grounds as relating to him or her. *See* Tex. R. App. P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included."). The nature of the evidence is such that we can consider their arguments together.

including one incident that he committed while N.A.B. was pregnant with N.B. and another incident committed in the presence of three other children N.A.B. had mothered.[2]  Further evidence tended to show that N.A.B. was likewise a drug user and that she had persisted in having a relationship with A.D.J. despite the violence he had inflicted on her.  The district court submitted to the jury, as alternative statutory grounds within broad-form termination issues, whether N.A.B. and A.D.J. had each: (1) knowingly placed or knowingly allowed their child to remain in conditions or surroundings which endanger the child's physical or emotional well-being; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the child's physical or emotional well-being; or (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.[3]  The jury found that each appellant's parental rights to N.B. should be terminated, and the district court rendered judgment accordingly.  This appeal followed.

---

[2]  A.D.J. was the father of one of these children and was helping N.A.B. raise the other two. Following this incident, the Department initiated proceedings to terminate the parental rights of N.A.B. and A.D.J. to these other children.  The proceedings concluded with voluntary relinquishment by both N.A.B. and A.D.J.

[3]  *See* Tex. Fam. Code § 161.001(1)(D), (E), (O).  In addition to these alternative statutory termination grounds, the termination issue also submitted whether termination of the parent's rights was in N.B.'s best interest.  *See* Tex. Fam. Code § 161.001(2).  Neither appellant challenges the jury's best-interest finding on appeal.

**STANDARD OF REVIEW**

As noted, N.A.B. and A.D.J. each challenge the legal and factual sufficiency of the evidence supporting jury findings underlying the district court's termination decree. In light of the "clear and convincing" burden of proof required to terminate parental rights,[4] our legal-sufficiency review requires us to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."[5] We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."[6] We should not, however, disregard "undisputed facts that do not support the finding."[7] "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient."[8]

In our factual-sufficiency review, "the inquiry must be 'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's

---

[4] *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007.

[5] *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

[6] *Id.*

[7] *Id.*

[8] *Id.*

3

allegations.'"[9] Although we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing," we must also consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding."[10] "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."[11]

## ANALYSIS

Each appellant challenges the legal and factual sufficiency of the evidence supporting each of the three alternative statutory grounds for termination as to him or her. We must affirm as to an appellant if the evidence is sufficient to support even one of these grounds.[12]

We will focus our analysis on the ground stated in Family Code section 161.001(1)(E), which provides that parental rights may be terminated if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."[13] "Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of Appellant's conduct, including acts, omissions, or failures to act."[14] "'Endanger' means to

---

[9] *Id*. (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)).

[10] *Id*.

[11] *Id*.

[12] *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

[13] Tex. Fam. Code § 161.001(1)(E).

[14] *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied).

expose to loss or injury; to jeopardize."[15] Although endangering conduct "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment," the conduct "need not be directed at the child."[16] Nor is it necessary that the child actually suffer injury.[17] "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."[18] The conduct "may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage."[19] "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."[20] Additionally, "[d]omestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment."[21] Similarly, exposing one's child to the risk of domestic violence from others may also constitute endangering conduct.[22]

---

[15] *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

[16] *E.N.C.*, 384 S.W.3d at 803 (citing *Boyd*, 727 S.W.2d at 533).

[17] *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (citing *Boyd*, 727 S.W.2d at 533).

[18] *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

[19] *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

[20] *Id.*; *see also Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E).")

[21] *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.").

[22] *See In re M.R.*, 243 S.W.3d 807, 818-19 (Tex. App.—Fort Worth 2007, no pet.); *Sylvia M. v. Dallas Cnty. Welfare Unit*, 771 S.W.2d 198, 204 (Tex. App.—Dallas 1989, no writ).

**A.D.J.**

The jury heard evidence tending to show that A.D.J. had an extensive history of committing acts of domestic violence. In his testimony, A.D.J. estimated that he had been convicted of assault between "six to eight times." Some of these assaults were committed against an ex-wife, M.J., while others were committed against N.A.B., and some of the assault convictions resulted in A.D.J. serving time in jail and prison.[23] According to the evidence presented at the hearing, these assaults included: (1) a May 2010 incident in which A.D.J. punched and strangled N.A.B. in front of her three children; (2) a June 2011 incident in which A.D.J. held N.A.B.'s head down on a bed, suffocating her and using such force that she later told the police that she had heard bones and joints in her neck and jaw "cracking"; and (3) a December 2012 incident, when N.A.B. was four months pregnant with N.B., in which A.D.J. grabbed N.A.B. from behind and attempted to strangle her.[24] When asked "why [he] hit women," A.D.J. testified that it was because he was "young, dumb, and stupid and didn't have the right coping skills," but he claimed that "going to the penitentiary"

---

[23] Copies of the judgments documenting these offenses were admitted into evidence, including: (1) a 2005 judgment of community supervision for the misdemeanor offense of assault-family violence; (2) a 2006 judgment revoking community supervision; (3) a 2008 judgment of conviction for the state-jail felony offense of assault-family violence; (4) a 2009 judgment of community supervision for the misdemeanor offense of assault-family violence; (5) a 2010 judgment of community supervision for the felony offense of assault-family violence; (6) a 2011 judgment revoking community supervision; (7) a 2011 judgment of conviction for the felony offense of assault-family violence; and (8) a 2013 judgment of conviction for the misdemeanor offense of assault-family violence.

[24] A.D.J. claimed that he did not know that N.A.B. was pregnant at the time of the assault. A.D.J. testified that he had "kind of seen her stomach growing a little bit" but "thought that it was food or gas or something." However, there was evidence presented that when A.D.J. was arrested for that assault, he had told officers that he had planned to accompany N.A.B. to a prenatal appointment that morning. This and other evidence, the jury could have reasonably inferred, indicated that A.D.J. did know that N.A.B. was in fact pregnant at the time he had assaulted her.

taught him to behave differently so that he could "stay the hell out of there." However, when the attorney for the Department observed that A.D.J. had "continued with that pattern of assaultive behavior toward women" even after having served time in prison, A.D.J. acknowledged, "Yeah, I didn't learn. . . . I didn't learn nothing."

In addition to the evidence of domestic violence, there was other evidence from which the jury could have reasonably inferred that A.D.J had engaged in conduct that endangered the child. Dr. Richard Yuen, a licensed psychologist, had performed a psychological evaluation on A.D.J. According to Yuen, A.D.J. reported that he had abused marihuana and alcohol since he was sixteen years old.[25] A.D.J. admitted during his testimony that he had used illegal drugs in the past but claimed that he no longer used illegal drugs. However, there was other evidence from which the jury could have reasonably inferred otherwise. Urinalysis test results indicated that in November 2013, A.D.J. had tested positive for marihuana, while hair-follicle tests conducted that same month indicated that A.D.J. had also tested positive for methamphetamine and cocaine. Hair-follicle testing also revealed that A.D.J. tested positive for cocaine in February 2014 and again in April 2014, which was approximately one month before the termination hearing. Dr. Ernest Lykissa, the Department's toxicology expert, testified that the amount of methamphetamine that was present in A.D.J.'s hair follicles in November 2013 indicated "very strong use" and that A.D.J. "was definitely under the influence of that drug for a while." Similarly, Lykissa testified that the amount of cocaine that was present in A.D.J.'s hair follicles in November 2013 indicated "habitual use" of that drug. On cross-examination, Lykissa acknowledged that hair-follicle testing may reveal higher amounts of drugs being present in the hair of African-Americans (as is A.D.J.) than in the hair

---

[25] At the time of the termination hearing, A.D.J. was 36 years old.

of Caucasians, because of genetic differences in the rate of hair growth. Nevertheless, Lykissa maintained that the test results in this case indicated "a cumulative strong use of cocaine."

There was also evidence presented that A.D.J. had attempted suicide on at least two occasions. A.D.J. testified that he had first attempted suicide at the age of nineteen by overdosing on ibuprofen. The second attempt was recent, occurring in July 2013 during the pendency of this case. A.D.J. testified that this suicide attempt involved overdosing on alcohol. Additionally, Kristi Kaiser, a licensed professional counselor who had provided counseling to A.D.J., testified that A.D.J. had informed her that he had a history of suicide attempts, including "multiple attempts by [overdosing], jumping in front of traffic, and attempting to hang himself."

Viewing the above and other evidence in the light most favorable to the jury's finding, we conclude that the evidence is legally sufficient to support a finding that A.D.J.'s conduct endangered the physical and emotional well-being of his child. A.D.J. had committed multiple acts of violence against his child's mother, including one assault that was committed in the presence of their other children and another assault that was committed while the mother was pregnant with N.B. In addition to his well-documented history of violence against women, the evidence also tended to show that A.D.J. was a habitual drug user, convicted felon, and had attempted to kill himself on multiple occasions. All of these actions, the jury could have reasonably inferred, subjected N.B. to a life of uncertainty and instability that jeopardized the child's well-being.

We reach the same conclusion when considering the disputed evidence in the case. There was disputed evidence regarding the extent of A.D.J.'s drug use and whether it was an ongoing problem. There was also disputed evidence regarding the extent of the domestic violence that A.D.J. had committed against N.A.B., as both A.D.J. and N.A.B. had provided testimony that attempted to

8

minimize the seriousness of the incidents and downplay the severity of N.A.B.'s injuries. We cannot conclude that this evidence is "so significant" that a fact-finder could not reasonably have formed a firm belief or conviction that A.D.J.'s conduct in repeatedly assaulting N.A.B., among other conduct, had endangered his child's physical and emotional well-being. On this record, we conclude that the evidence is also factually sufficient to support the jury's finding that A.D.J. had committed at least one of the statutory grounds for termination.

**N.A.B.**

The Department's case against N.A.B. was based on her drug use and on her persistence in maintaining contact with A.D.J. despite his repeatedly violent behavior. The jury heard evidence tending to show that in January 2014, police had found N.A.B. in a car with A.D.J., smoking marihuana together, in violation of a protective order that had been issued at the beginning of this case. Additionally, N.A.B. testified that she was currently pregnant with another child, and she acknowledged the possibility that A.D.J. was the father of this child because they had been sexually intimate around the time she became pregnant. Moreover, this was not the first time that N.A.B. had allowed A.D.J. back into her life. N.A.B. testified that in November 2010, following A.D.J.'s release from jail, she had allowed A.D.J. to move back in with her and her children, despite the fact that A.D.J. had already committed multiple assaults against her, including incidents in 2008 and 2010 during which, according to statements made by N.A.B., A.D.J. had "punched [her] in the face" and "strangled" her. When asked why she had allowed A.D.J. to return, N.A.B. testified that she "really didn't see a problem with him coming back home." Yet shortly after A.D.J.'s return, the assaults resumed, including a March 2011 incident in which A.D.J. had bitten N.A.B.'s face at a gas station during an argument and a June 2011 incident in which A.D.J. had thrown N.A.B. onto

9

a bed and held her head down on the bed with such force that she felt like she was suffocating. Although N.A.B. claimed that she did not plan on continuing a relationship with A.D.J. after this case concluded, she also testified that she did not want "to keep [A.D.J.] from his son" and added that her child "needs the structure of a father." Following this response, the attorney for the Department asked N.A.B. to explain "what has changed" such that N.A.B. would no longer allow A.D.J. to be a part of her life:

Q      You didn't end your relationship with [A.D.J.] after he strangled you and didn't end your relationship with [A.D.J.] after three of your children were adopted by other people. You didn't end your relationship with [A.D.J.] after CPS and a judge removed your new baby. You didn't end your relationship with [A.D.J.] despite a new CPS case being started. What has changed that all of a sudden now, after four children, two strangulations, multiple trips to the hospital, to EMS—what has changed now that all of a sudden you realize he is not going to be a part of your life?

A      I can't answer that right now.

Q      And if he is too dangerous—

A      It's easier—it is easier done than say it.

Q      And if he is too dangerous to be around you, why is it okay for him to be around your baby?

A      I don't—he is his father. He is his father. I was around my father. He was abusive to my mother, but he was a father to me. I never said it was—I never said it was a good thing that it was—it's okay to be raised in a home like that.

Additionally, the evidence tended to show that A.D.J. was not the first violent man with whom N.A.B. had been intimately involved. N.A.B. testified that P.A., the father of her second child, had committed acts of domestic violence against her "maybe once or twice" and that her child was present during one of these incidents. N.A.B. also testified that she did not report the assaults

10

to the police. From this evidence, the jury could have reasonably inferred that if A.D.J. was violent to N.A.B. in the future, N.A.B. might not report the assaults to the police. The jury also could have reasonably inferred from this and other evidence that N.A.B. had a history of being with, tolerating, and exposing her other children to violent men and that such exposure to violence endangered N.B.'s physical and emotional well-being.

The Department also presented evidence tending to show that N.A.B. was a drug user. N.A.B. testified that she was "probably" using marihuana in 2007, while she was pregnant with another child. Also, N.A.B. acknowledged that while the prior CPS case with her other children was ongoing, she was smoking marihuana almost daily, while the children remained in her care. When asked if she was smoking marihuana "with your children in the house," N.A.B. testified, "They were probably outside or something, but yeah, they were home." N.A.B. also admitted that she had used marihuana "like two or three times" at the beginning of this case and had also used cocaine while this case was ongoing, although she claimed that she had consumed only "one line" of cocaine and only "one time." Again, however, the jury heard evidence from which it could reasonably infer that N.A.B.'s drug use was an ongoing problem. In August 2011, during the prior CPS case, N.A.B. had tested positive for cocaine. She again testified positive for cocaine in November 2013 and February 2014. According to Dr. Lykissa, the test results indicated "active" or "continuous" use rather than one-time use. Additionally, when N.A.B. was referred by CPS to a substance abuse treatment center in January 2014, N.A.B. reported that she had last used cocaine in September or October 2013 but that she would use cocaine "around the first of each month since June 2013 in the past year and would use 2-3 times in the beginning of the month." According to the caseworker's report, N.A.B. met "DSM-IV criteria for cocaine abuse as evidenced by continued

11

substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance." Based on this diagnosis, the caseworker recommended that N.A.B. complete an intensive outpatient drug-treatment program. However, it was undisputed that N.A.B. had not yet started the treatment program at the time of the termination hearing.

Viewing the above and other evidence in the light most favorable to the jury's finding, we conclude that the evidence is legally sufficient to support a finding that N.A.B.'s conduct endangered the physical and emotional well-being of N.B. N.A.B. continued to have contact with A.D.J. despite the violence that he had inflicted on her both before and during her pregnancy and despite the existence of a protective order prohibiting such contact. Thus, the jury could have reasonably inferred that N.A.B. would expose her child to the risk of domestic violence if her parental rights were not terminated and that such violence would jeopardize the child's physical and emotional well-being. Additionally, it is undisputed that N.A.B. had used marihuana and cocaine both in the past and while this case was pending. Because N.A.B. had failed to begin treatment for her drug use, the jury could have reasonably inferred that this drug use would continue after the case had concluded and that N.A.B.'s continued drug use would subject the child to a life of uncertainty and instability that jeopardized the child's physical and emotional well-being.

We reach the same conclusion when considering the disputed evidence in the case. The disputed evidence regarding N.A.B. concerns the extent of her relationship with A.D.J. and the extent of her drug use. N.A.B. presented some evidence tending to show that she has had only occasional contact with A.D.J. since the case began and that her drug use had been sporadic rather than continuous, again relying on the theory that hair-follicle test results for African-Americans tend to be skewed. We cannot conclude that this evidence is "so significant" that the jury could not

12

reasonably have formed a firm belief or conviction that N.A.B.'s conduct had endangered the child. Even if N.A.B. had not used drugs to the extent the Department claimed, it is undisputed that she had used drugs while this case was ongoing and had not yet begun drug treatment. And even if N.A.B. had only occasional contact with A.D.J. while this case was ongoing, such contact was nevertheless in violation of a court order and included sexual activity that had created at least the possibility that A.D.J. was responsible for N.A.B.'s latest pregnancy. On this record, we conclude that the evidence is also factually sufficient to support the jury's finding that A.D.J. had committed at least one of the statutory grounds for termination.

Having concluded that at least one of the statutory grounds for termination is supported by legally and factually sufficient evidence, we need not address the other grounds.[26] We overrule N.A.B.'s and A.D.J.'s three issues on appeal.

## CONCLUSION

We affirm the district court's decree of termination.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed: November 26, 2014

---

[26] *See* Tex. R. App. P. 47.1.