**Opinion issued December 14, 2017**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00545-CV

————————————

## IN THE INTEREST OF L.N.W., A CHILD

---

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2016-05060J**

---

## MEMORANDUM OPINION

K.S. appeals from the trial court's judgment terminating her parental rights to her daughter, L.N.W. In one issue, K.S. contends that the evidence is factually insufficient to support a finding that termination of her parental rights is in the child's best interest. We affirm.

## Background

On August 8, 2016, the Department of Family and Protective Services ("the Department") received a referral alleging neglectful supervision of L.N.W., a two-month old infant, by her mother, K.S., and her father, A.W.[1] The referral alleged that K.S. and A.W. have bipolar disorder and a history of marijuana use. The referral also alleged that A.W. does not take his bipolar medication and has been violent toward K.S.

On August 15, 2016, the Department received a second referral alleging neglectful supervision of L.N.W. The referral stated that L.N.W.'s paternal great-grandmother, Pamela Smith, had been taking care of L.N.W. since she was born; A.W. and K.S. saw L.N.W. on August 12, 2016, despite the fact that A.W. was not supposed to be around the infant because of his drug use and mental health issues; and K.S was going to be hospitalized for mental health treatment.

On September 15, 2016, the Department filed its original petition for child protection, conservatorship, and termination of parental rights, accompanied by the affidavit of Cassandra Warren, a Department caseworker. In support of the Department's request that it be named temporary managing conservator of L.N.W., Warren stated that K.S. and A.W. suffered from bipolar disorder and had stopped taking their medication; K.S. and A.W. had a history of marijuana use and the

---

[1] A.W. is not a party to this appeal.

Department was concerned that K.S. was using marijuana around L.N.W; A.W. had been violent toward K.S.; K.S. had a pending criminal case for domestic violence (family assault) for assaulting her sister with whom she lived in violation of court orders; and K.S. and A.W. had their parental rights to K.W., their one-year old daughter, terminated in December 2015 on the grounds that they had engaged in conduct endangering to the child and had failed to comply with the provisions of a court order establishing the tasks necessary for reunification.

In her affidavit, Warren attested as follows:

- At the beginning of her investigation, K.S. initially refused to speak with her and Warren called the police for assistance. Before the police arrived, Nicole Smith, K.S.'s mother, and Sandra Manley, K.S.'s maternal grandmother, arrived at the house and K.S. agreed to speak with Warren. K.S., who lived with her mother and sister, Sandra, told Warren that there was currently no domestic abuse in the home but that A.W. had previously abused her by hitting her when he became upset, and that much of the abuse took place when she was pregnant with K.W., L.N.W.'s older sibling. K.S. told Warren that she was no longer in a relationship with A.W. but that they continued to communicate every other day.

- K.S. told Warren that she was diagnosed with depression but denied being bipolar. She told Warren that she has not been on medication for two years

3

because she "can handle [her] depression," and her psychiatrist said that she no longer needed to take it. K.S. told Warren that she sees Dr. Mark Lewis, a therapist at King Haven Southwest, every two weeks. She denied using drugs and the results of her urinalysis test conducted the next day were negative. Warren noted that K.S. had everything necessary to care for L.N.W. in the home, including a bassinet, diapers, and formula, and that L.N.W. showed no signs of physical abuse or neglect. Warren spoke with Nicole who denied that K.S. had any mental health issues. Nicole stated that K.S. had been a victim of A.W.'s domestic violence in the past which was one of the reasons that K.S. moved into Nicole's home. Warren also spoke with K.S.'s sister, Sandra, a high school senior, who said that K.S. did not have any mental health issues and that she is an excellent mother who provides all the care for L.N.W.

- On August 15, 2016, Warren contacted the medical records department of King Haven Southwest and learned that K.S. was enrolled only in therapy, had not seen a psychiatrist, and had not received services since May 2013.

- On August 16, 2016, K.S. called Warren and told her that she was checking herself into West Oaks Hospital and that L.N.W. was with a family member but would not disclose the child's location. Warren spoke with Pamela Kerr-Smith, A.W.'s grandmother, who told Warren that she has had L.N.W. in her care every weekend since she was born and that she was currently taking

4

care of L.N.W. Kerr-Smith told her that K.S. asked her to take care of L.N.W. until she could get herself together and get back on her medication. Kerr-Smith told Warren that K.S. and A.W. both have mental concerns that need to be addressed.

- On August 17, 2016, Nicole contacted Warren and told her that K.S. is not taking her medication and would not leave A.W. alone. Nicole told Warren that K.S. was diagnosed with Attention Deficit Hyperactivity Disorder and that she recently left Nicole's house and said she wished Nicole was dead.

- On August 19, 2016, Warren spoke with K.S. in order to schedule a family team meeting. Three days later, Warren learned that K.S. had been arrested and charged with aggravated assault of a family member. Nicole informed Warren that K.S. had attempted to cut Sandra with a knife. Nicole expressed concern that K.S would continue to refuse to take her medication upon her release from jail, and Nicole wanted to speak to a judge "to ensure that they put something in place so [K.S.] can stay on her medication." On September 9, 2016, K.S. received deferred adjudication and three years' community supervision for assaulting Sandra. Kerr-Smith continued to care for L.N.W. until K.S. was released from jail.

- On September 11, 2016, Kerr-Smith called Warren and told her that K.S. came to pick up L.N.W. Kerr-Smith also reported that L.N.W. received a burn to

5

her leg one week earlier, and that when K.S. saw the burn on her leg she took L.N.W. to the doctor.

- On September 14, 2016, L.N.W.'s family participated in a family team meeting. At the meeting, Nicole admitted that she had not been forthcoming about K.S.'s mental health or the domestic violence involving her daughter. K.S. disclosed that she was diagnosed with bipolar disorder as well as depression. L.N.W. was at the meeting and had a "burn the size of an apple . . . with red coloring on her right lower extremity."

- Warren concluded that K.S. (1) was diagnosed with bipolar disorder and had stopped taking her medication without doctor approval; (2) was charged with assaulting her sister with a knife; (3) was still residing with Sandra in violation of the terms of her community supervision; (4) had her parental rights to K.W. terminated approximately six months before L.N.W. was born due to her mental instability and failure to complete services with the Department. Warren stated that K.S. was unable to provide a safe and stable environment for L.N.W. at this time and that she had no other viable relatives with whom to place L.N.W.

On September 15, 2016, the trial court signed an order for protection of a child in an emergency in which it found a continuing danger to L.N.W. which warranted placing the child in the Department's temporary managing conservatorship. On

6

September 29, 2016, following a full adversary hearing, the trial court signed an order stating that there was sufficient evidence of a danger to L.N.W.'s physical health and safety, and that the need to protect the child warranted her immediate removal from her parents' care. The court named the Department as L.N.W.'s temporary managing conservator.

On October 3, 2016, K.S. participated in a family evaluation at the Children's Crisis Care Center ("4 Cs"). K.S. denied the substance of the Department's allegations. In particular, she denied any substance use and stated that she has always tried to address her mental health needs, that she complied with and completed all of the Department's services during her previous case, and that her parental rights were wrongfully terminated. She acknowledged that her continued relationship with A.W. was a concern but said that she ended the relationship with him. She reported some history of domestic violence but she attributed A.W.'s unfaithfulness as the cause of their relationship ending, and she did not consider the domestic violence to be a traumatic event.

The 4 Cs report noted a concern with "[K.S.]'s extremely low parenting scores, which suggests that she is not fully able to conceptualize and [meet] the basic needs of her daughter." The report also noted that K.S. appeared "to have possible low cognitive functioning, insufficient coping skills, and limited awareness of the severity of the presenting issues in her life, and that her decision-making has been a

7

causal factor for the removal of her children." It was also noted that K.S. participated in a family assessment in March 2015 in her previous case, and that "it appears that similar issues are presenting and do not appear to have [been] addressed as recommended from the previous assessment." The report concluded that "[K.S.]'s cognitive functioning in the areas of understanding risks of her domestic violence relationship, appropriate skills for caring for a child with little support, and the importance of stability in her life are barriers to her being able to provide a young child with the safety, stability and protection needed." The report recommended that K.S. (1) participate in a psychological evaluation to determine her current level of cognitive and mental health functioning and to make recommendations for mental health treatment; (2) continue psychiatric services to monitor and maintain her mental health needs and treatment; (3) attend individual counseling; (4) participate in domestic violence treatment services; and (5) attend parenting classes to increase her knowledge and ability to understand the needs of a child in her care.

On November 8, 2016, the trial court held a status hearing. In a separate order, the trial court granted the Department's request for a finding of "aggravated circumstances," thereby waiving the requirement that the Department provide K.S. with a family service plan or that it make reasonable efforts to return L.N.W. to

8

K.S.'s care.[2]  Nonetheless, the Department prepared a family service plan for K.S. which set as goals that K.S. (1) learn and use parenting practices that meet the emotional and developmental needs of L.N.W.; (2) learn to exercise self-control to provide L.N.W. with a sense of stability; and (3) demonstrate an ability to provide basic necessities such as food, clothing, shelter, medical care, and supervision for the child.  The service plan also recommended several services to achieve these goals.

The State filed a motion to adjudicate guilt in K.S.'s aggravated assault case which the trial court granted on January 19, 2017.  The motion stated that K.S. violated the terms and conditions of her community supervision by: (1) possessing drug paraphernalia; (2) possessing duplicate identification cards; (3) failing to participate in a substance abuse program; (4) failing to participate in a "Thinking for a Change" program; and (5) having contact with her sister, Sandra, in violation of the court's protective order.  K.S's criminal case was later dismissed upon the State's motion.

---

[2]  Family Code section 262.2015 lists numerous "aggravating circumstances" which permit a trial court to waive the requirements that the Department create a family service plan and that it make reasonable efforts to return the child.  *See* TEX. FAM. CODE ANN. § 262.2015 (West Supp. 2017).  As relevant here, one of those circumstances is when a parent has had her parent-child relationship terminated with respect to another child under section 161.001(b)(1)(E).  *See id.*

On May 10, 2017, the Department filed a permanency report with the court. In its report, the Department noted that L.N.W. had been living in a foster home since September 14, 2016, the date on which she was removed from K.S.'s care. The report described L.N.W. as "a happy 7 month [old] female who is placed in an adoptive home where her sibling has already been adopted. L.N.W. is developmentally on target and bonded with the current caregiver." The report further noted that "[t]he goal of unrelated adoption was set at the time the case was transferred to conservatorship. There are no suitable relatives that have been identified for placement of [L.N.W.]. [L.N.W.] is in a stable adoptive placement w[h]ere she is able to be with her sister who has already been adopted by the family. The agency will continue to search for suitable relatives, but at this time remaining with her sibling in a permanent placement is in [L.N.W.]'s best interest."

On May 18, 2017, L.N.W.'s guardian ad litem, a Child Advocates, Inc. volunteer, filed a report with the court stating that termination of both parents' rights was in L.N.W.'s best interest based on the following grounds: (1) both K.W. and L.N.W. were brought into the Department's care shortly after birth and within one year of each other; (2) parental rights to K.W. were terminated; (3) neither parent has shown any significant lifestyle changes; (4) both parents should be taking medication for their bipolar disorder but, to the ad litem's knowledge, both were non-compliant; (5) both parents have a history of domestic violence; and (7) K.S.

has been incarcerated during the case for violent behavior. The ad litem also recommended that L.N.W. remain in her current foster placement. In support of the recommendation, the ad litem stated that "[L.N.W.] has been in the current foster home placement since September 14, 2016. [L.N.W.] is placed with her biological sibling who was adopted by the current caregivers. The current caregivers are also interested in adopti[ng L.N.W.] as well. [L.N.W.] is thriving in the home and is very bonded to the family. All of [L.N.W.]'s needs are being met by the current placement."

The bench trial began on May 23, 2017. K.S. was present at trial.[3] Prior to calling its first witness, the Department introduced numerous exhibits, which the trial court admitted, including the following: (1) Warren's affidavit in support of removal; (2) the September 15, 2016 emergency order; (3) the September 29, 2016 temporary order following adversary hearing; (4) the November 8, 2016 status hearing order and family service plans; (5) the November 2016 order finding "aggravated circumstances"; (6) the final decree of termination in K.W.'s case; (7) 4 Cs records; (8) West Oaks Psychiatric Hospital records; (8) K.S.'s criminal history records; (9) Child Advocate, Inc.'s report; and (10) the May 10, 2017 permanency report.

---

[3] A.W. was not present at trial.

11

Ashley Chamblee, the Department caseworker assigned to L.N.W.'s case, testified that L.N.W. was ten months old and was living in the adoptive foster home where she was placed when the Department initially removed her from her parents' care.

Chamblee detailed the facts leading to L.N.W.'s removal. She testified that K.S. was incarcerated for assaulting her sister, Sandra. While K.S. was in jail, L.N.W. lived with Kerr-Smith. During that time, L.N.W. sustained a burn but did not receive any medical care until K.S. was released from jail and took her to a doctor. Chamblee testified that K.S.'s parental rights to K.W., L.N.W.'s sister, were terminated on the basis that she had endangered the child.

Chamblee testified that the Department created a family service plan for K.S. but stated that she did not receive any proof that K.S. had participated in any of the plan's services. Chamblee stated that L.N.W. was living with the same foster family who had adopted K.W. following the termination of K.S.'s and A.W.'s parental rights. Chamblee testified that termination of K.S.'s parental rights to L.N.W. was in the child's best interest because of K.S.'s prior history with the Department, her mental health issues, and the fact that L.N.W. was living in a stable home with her sibling. Chamblee confirmed that K.S.'s medical records from West Oaks Psychiatric Hospital in 2012, which were admitted at trial, reflect that K.S. expressed a desire to kill herself and that she tried to choke herself.

12

Chamblee testified that K.S. visited L.N.W. for one hour every other week during the pendency of the case. When asked if L.N.W. appeared to be bonded with K.S., Chamblee responded, "We actually have to have the foster parent in the visits with us, otherwise the child screams and screams until she almost makes herself sick. So the only way we can have visits is if the foster parent is in the room to help the child calm." Chamblee stated that, to her knowledge, K.S. had never contributed financially to L.N.W.'s care.

Chamblee testified that K.S. was diagnosed with bipolar disorder and depression and that these conditions have remained largely untreated. Chamblee stated that K.S. has been in denial about her mental health issues during the pendency of this case as well as during her previous case with the Department. When the current case began, K.S. denied that she was on medication and that she had been seeing a psychiatrist.

Chamblee testified that K.S. was charged with aggravated assault of a family member after she pulled a knife on her sister. She stated that K.S. later violated the terms of her probation when she continued to live with her sister. Chamblee testified that there were allegations of domestic abuse between K.S. and A.W. that occurred prior to L.N.W.'s birth, and that K.S. remained with A.W. despite the violence. Chamblee stated that L.N.W. was exceedingly well taken care of in her current foster home and that she was living with her biological sister.

13

Chamblee testified that Nicole was not considered a viable placement for L.N.W. because, for a significant period of time during the pendency of the case, K.S. was living with Nicole and her sister despite the fact that Nicole knew it violated the terms of K.S.'s probation. Chamblee further stated that Nicole appeared to be in denial about K.S.'s mental health issues, and provided conflicting information about the domestic violence in K.S.'s relationship with A.W. Chamblee confirmed that Nicole was participating in the care of K.W. when K.W. was removed due to medical neglect, and that Nicole failed to be protect the child. For these reasons, Nicole was not considered as a possible placement for L.N.W.

LaToya Porter, the Child Advocate volunteer, worked on the case since October 2016. She agreed with the Department's goal to terminate K.S.'s parental rights and stated that termination of K.S.'s parental rights was in L.N.W.'s best interest because K.S. failed to show any significant change in her circumstances since L.N.W. was placed in the Department's care, and L.N.W. was living in an adoptive home with her biological sibling.

Nicole filed an intervention in the case requesting that L.N.W. be placed with her. At trial, Nicole testified that K.S. lived with her but moved out when she went to jail for assaulting her sister, and then later moved in with Nicole's mother. Nicole denied telling Chamblee that K.S. and A.W. did not have problems in their relationship. She testified that they do, in fact, have problems, and that she would

14

be willing to protect L.N.W. from those problems. Nicole testified that she does not like A.W. and that he has a drug problem. She further testified that she did not think K.S. and A.W. should be around L.N.W. "until they get on their medication." She denied that K.S. has a drug problem; rather, she thinks her problem is "being with [A.W.]" and not taking her medication.

At the conclusion of the hearing, the Department requested termination of K.S.'s and A.W.'s parental rights under subsection (M) of Family Code section 161.001(b)(1) and that the court maintain L.N.W.'s current placement. The attorney ad litem for L.N.W. concurred with the Department's request. The trial court granted the Department's request, approved L.N.W.'s foster placement, and appointed the Department as L.N.W.'s sole managing conservator. On June 22, 2017, the trial court signed its final decree of termination, in which it listed section 161.001(b)(1)(M)[4] as the basis for terminating K.S.'s parental rights, and found that

---

[4] As relevant here, section 161.001(b)(1) states that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence, in addition to the best interest finding, that the parent has:

. . . .

(M) had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state[.]

TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (West 2014).

15

termination of parental rights was in L.N.W.'s best interest.[5]   This timely appeal followed.

## Discussion

K.S. acknowledges that the evidence is sufficient to support the predicate finding under Family Code section 161.001(b)(1)(M) and does not challenge that finding on appeal.  She also concedes that the evidence is legally sufficient to support the trial court's finding that termination was in L.N.W.'s best interest.  In her sole issue, K.S. argues that the evidence is factually insufficient to support the trial court's best interest finding.

### A. Burden of Proof and Standard of Review

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review.  *See In re A.V.*, 113 S .W.3d 355, 361 (Tex. 2003).  A parent's rights to "the companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397 (1982); *see In re M.S.*, 115 S.W.3d 534, 548 (Tex. 2003).  Accordingly, we strictly scrutinize termination proceedings and strictly construe the

---

[5]   The trial court also terminated A.W.'s parental rights pursuant to section 161.001(b)(1)(M), and found that termination was in the child's best interest.

involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

In a case to terminate parental rights under section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)-(2). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002) (quoting TEX. FAM. CODE ANN. § 101.0007). "Only one predicate finding under section 161.001(1)[(b)] is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362.

When conducting a factual sufficiency review, we consider and weigh all of the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

17

We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B. Best Interest of the Child

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2017).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list of factors is not exhaustive, however, and evidence is not required on all of the factors to

support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Moreover, we note that evidence supporting termination under one of the grounds listed in section 161.001(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest).

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2017); *In re R.R.*, 209 S.W.3d at 116.

### 1. Child's Desires and Needs, and Parental Abilities of Persons Seeking Custody

The first and second *Holley* factors consider the desires of the child and the present and future physical and emotional needs of the child. The fourth *Holley* factor looks at the parental abilities of those seeking custody of the child.

When children are too young to express their desires, the fact finder may consider whether the children have bonded with the proposed adoptive family, are well cared for by them, and have spent minimal time with a parent. *See In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the child is relevant to the best interest determination. *See In re C.H.*, 89 S.W.3d at 28.

At the time of trial, K.S. was ten months old and, thus, too young to testify about her desires. *See In re T.G.R.-M.*, 404 S.W.3d 7, 16 (Tex. App.—Houston [1st Dist.] 2013, no pet.). However, when Chamblee was asked whether L.N.W. appeared to be bonded with K.S. during their visits every other week, she responded, "We actually have to have the foster parent in the visits with us, otherwise the child screams and screams until she almost makes herself sick. So the only way we can have visits is if the foster parent is in the room to help the child calm." The

20

Department also presented evidence that L.N.W. has been in her current foster home since shortly after her birth, she is a happy child who is very bonded to her foster family, and she is living with her biological sibling who was previously adopted by the family. L.N.W.'s current foster family has also expressed interest in adopting her.

With regard to L.N.W.'s present and future physical and emotional needs and the parental abilities of those seeking custody of L.N.W., Warren noted during her visit to K.S.'s home in August 2016 that K.S. had everything necessary to care for L.N.W. in the home, including a bassinet, diapers, and formula. K.S.'s sister told Warren that K.S. was an excellent mother who provided all the care for L.N.W.

Chamblee testified that L.N.W. is developmentally on target, that she is "exceedingly well taken care of" in her foster family and that all of her needs are being met by the family, and that she is thriving in the foster placement. Chamblee testified that, to her knowledge, K.S. had never contributed financially to L.N.W.'s care after L.N.W. was removed.

We may also consider the parent's past performance as a parent in evaluating her present abilities to provide for the child. *See In re C.H.*, 89 S.W.3d at 28. Although evidence of past misconduct or neglect alone may not be sufficient to show present unfitness, a fact finder may measure a parent's future conduct by her past conduct indicating that it is in a child's best interest to terminate her parental rights.

21

*See In re A.N.D.*, No. 02–12–00394–CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.).

Here, the record shows that K.S.'s parental rights to her one-year old daughter, K.W., were terminated approximately six months before L.N.W. was born, based on the trial court's finding that K.S. had engaged in conduct which endangered the physical or emotional well-being of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). In a report filed with the court shortly before trial, the Child Advocate volunteer stated that K.S. had not shown any significant lifestyle changes since her parental rights to K.W. were terminated. The 4 Cs report also noted that K.S. had participated in a family assessment in her previous case but that "it appears that similar issues are presenting and do not appear to have [been] addressed as recommended from the previous assessment." The report noted a concern with "[K.S.]'s extremely low parenting scores, suggesting that she is not fully able to conceptualize and [meet] the basic needs of her daughter." The report also stated that "[K.S.]'s cognitive functioning in the areas of understanding risks of her domestic violence relationship, appropriate skills for caring for a child with little support, and the importance of stability in her life are barriers to her being able to provide a young child with the safety, stability and protection needed."

This evidence supports the trial court's best interest finding under the first, second, and fourth *Holley* factors. *See also* TEX. FAM. CODE ANN. § 263.307(b)

22

(listing child's age, child's physical and mental vulnerabilities, and parent's understanding of child's needs and capabilities among factors to be considered in determining whether child's parents are willing and able to provide child with safe environment).

### 2. Plans for the Child and Stability of Home or Proposed Placement

The sixth *Holley* factor considers the plans for the child by the individuals or agency seeking custody. The seventh factor looks at the stability of the home or proposed placement.

Stability and permanence are paramount in the upbringing of children. *In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *7 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.); *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). "Without stability, income, or a home, [a parent] is unable to provide for the child's emotional and physical needs" and the parent's instability "threatens the physical well-being of the child and may put the child at risk." *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.). A parent's failure to show that she is stable enough to parent a child for any prolonged period entitles the trial court "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14–04–00496–CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.).

In support of her assertion that she has a stable home for L.N.W., K.S. points to the 4 Cs report stating that she lived with Manley, her grandmother, in October 2016, seven months before trial. However, there was no evidence presented at trial showing that she still lived there or that Manley expressed the desire or ability to take L.N.W. into her home. Chamblee testified that she did not know where K.S. was living at the time of trial. In August 2016, Kerr-Smith told Warren that K.S. had left L.N.W. in her care every weekend since she was born, and that K.S. later asked her to take care of L.N.W. until she could get herself together and get back on her medication. There was no evidence showing that K.S. was employed or how she intended to support L.N.W. Chamblee testified that, to her knowledge, K.S. had never contributed financially to L.N.W.'s care. The 4 Cs report also noted that "[K.S.]'s cognitive functioning in the areas of understanding risks of her domestic violence relationship, appropriate skills for caring for a child with little support, and the importance of stability in her life are barriers to her being able to provide a young child with the safety, stability and protection needed." Chamblee testified that L.N.W.'s current foster family, with whom L.N.W. has lived since she was born, expressed interest in adopting L.N.W., and that she is exceedingly well cared for in her current foster placement. This evidence supports the trial court's best interest finding under the sixth and seventh *Holley* factors. *See also* TEX. FAM. CODE ANN.

24

§ 263.307(b) (listing safe physical home environment as factor to be considered in determining best interest of child).

### 3. Endangering Conduct and Parental Acts or Omissions

The third *Holley* factor examines the present and future emotional and physical danger to the child. *Holley*, 544 S.W.2d at 371–72. The eighth factor considers acts or omissions of the parent that indicate the parent-child relationship is improper. *Id.*

Mental illness alone is not grounds for terminating the parent-child relationship. *In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *Maxwell v. Tex. Dep't of Family & Protective Servs.*, No. 03–11–00242–CV, 2012 WL 987787, at *9 (Tex. App.—Austin Mar. 23, 2012, no pet.) (mem. op.). Untreated mental illness, however, can expose a child to endangerment and is a factor the court may consider. *See Maxwell*, 2012 WL 987787, at *10; *In re L.L.F.*, No. 02–11–00485–CV, 2012 WL 2923291, at *15 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) (considering parent's failure to take medication to treat mental health issues as factor in creating environment that endangers child's emotional or physical well-being); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (considering parent's mental health and noncompliance with her medication schedule as factors endangering child).

Here, the record reflects that K.S. has mental health issues that remained largely untreated during the pendency of the case. K.S. was diagnosed with bipolar disorder and depression but initially denied having bipolar disorder. K.S. told Warren that she has not been on medication for two years because she "can handle [her] depression," and her psychiatrist said that she longer needed to take it. Although K.S. told Warren that she saw a therapist at King Haven Southwest every two weeks, K.S.'s medical records reflected that K.S. had not received services there since May 2013.

The record also shows that, at the beginning of the case, K.S. called Warren and told her that she was going to check herself into West Oak Hospital and asked Kerr-Smith to take care of L.N.W. until she could get back on her medication. Nicole also told Warren that K.S. was not taking her medication. Chamblee testified that K.S. has been in denial about her mental health issues during the pendency of this case as well as during her previous case with the Department. K.S.'s medical records from West Oaks Psychiatric Hospital include an initial psychiatric evaluation in 2012 in which the evaluating physician noted that K.S. had expressed a desire to kill herself. Further, the Department's service plan as well as the 4 Cs evaluation recommended that K.S. participate in a mental health assessment and continue with services to monitor and maintain her mental health needs and treatment. K.S. never provided proof to the Department that she had attempted to

do any of the services outlined in her service plan. The evidence of K.S. failure to comply with services to improve her mental health is a factor that the trial court could have considered in finding that she engaged in a course of conduct that endangered the physical and emotional well-being of L.N.W. *See id.* at 845–46 (finding mother's suicidal thoughts and history of noncompliance with medication schedule relevant to endangerment and best interest analysis); *see also Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 798 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (considering mother's mental health issues, hospitalizations, violent history, and noncompliance with medications in concluding termination was in child's best interest).

The evidence also reflects that K.S. was convicted of misdemeanor assault in 2012, for which she was sentenced to three days in jail. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) (noting parent's past conduct is probative of her future conduct when evaluating child's best interest). In 2016, while this case was pending, K.S. was convicted of aggravated assault–family member for threatening her sister with a knife. *In re T.G.R.-M.*, 404 S.W.3d 7, 14 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (stating that one factor that may contribute to environment that endangers child's well-being is parent's violent criminal conduct); *In re J.I.T.P.*, 99 S.W.3d at 845 (noting that parent's violent conduct can produce home environment that endangers child's well-being).

27

The evidence also shows that K.S. had been in an abusive relationship with A.W. K.S. told Warren that there was currently no domestic abuse in the home but that A.W. had previously abused her by hitting her when he became upset and that much of the abuse took place when she was pregnant with K.W. K.S. told Warren that she was no longer in a relationship with A.W. but that they continue to communicate every other day. K.S. also acknowledged during her 4 Cs evaluation that her continued relationship with A.W. was a concern but said that she ended the relationship with him. The report noted, however, that K.S. did not consider the domestic violence to be a traumatic event, and she attributed A.W.'s unfaithfulness as the cause of their relationship ending. At trial, Nicole testified that K.S.'s problem is "being with [A.W.]" and not taking her medication. *See Sylvia M. v. Dallas Cty. Welfare Unit*, 771 S.W.2d 198, 201, 204 (Tex. App.—Dallas 1989, no writ) (finding evidence of endangerment, including "volatile and chaotic" marriage, altercation during pregnancy, and mother's repeated reconciliation with abusive spouse, supported termination of parental rights). The evidence of untreated mental issues, violent conduct, and domestic abuse supports the trial court's best interest finding under the third and eighth *Holley* factors.

In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the best interest finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that

28

termination of K.S.'s parental rights is in L.N.W.'s best interest. *See In re H.R.M.*, 209 S.W.3d at 108. After considering the relevant factors under the appropriate standards of review, we hold that the evidence is factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the child's best interest. Accordingly, we overrule K.S.'s issue.

## Conclusion

We affirm the trial court's judgment.


Russell Lloyd
Justice

Panel consists of Justices Higley, Massengale, and Lloyd.