**Affirmed and Memorandum Opinion filed November 5, 2019**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00437-CV

## IN THE INTEREST OF A.R.E. AND Z.K.E., CHILDREN

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-02174J**

## MEMORANDUM OPINION

In this accelerated appeal a mother seeks reversal of the trial court's final decree terminating her parental rights to two young children. She challenges the legal and factual sufficiency of the evidence to support the trial court's findings on two predicate termination grounds and its finding that termination of her parental rights is in the best interest of the children. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

S.F. ("Mother") is the natural parent of A.R.E. ("Adam") and Z.E. ("Zach"),

the two young children at the center of this termination suit.[1] A.R.E. ("Father") is the natural parent of Zach. The trial court terminated both Mother's and Father's parental rights to Zach and Mother's parental rights to Adam. Father has not appealed. Adam's natural father relinquished his rights by an irrevocable affidavit of relinquishment and has not appealed.

## A. Pretrial Removal Affidavit

In April 2017, the Department of Family and Protective Services ("the Department") received a referral stating that law enforcement had been called to Mother's and Father's apartment because Father allegedly had fired a gun at another individual. When law enforcement officers arrived, they could see one-year-old Adam peeking out of the blinds of the apartment. Upon entering the home, law enforcement officers saw Father and two others smoking marijuana. Mother was in the kitchen with one-month-old Zach. The officers saw cocaine, marijuana, and drug paraphernalia, including glass pipes, rolling paper, and scrapers used for heroine, on the kitchen counter. They found a gun in a trash can easily accessible by one-year-old Adam. Police immediately arrested Father for aggravated assault with a deadly weapon, possession of cocaine, and unlawful possession of a firearm. Law enforcement officers allowed Mother to leave with the two children because she denied using drugs and claimed to be trapped in the relationship with Father. Father's father retrieved Mother and the children and took them to stay at his home.

A Department investigator met with Mother the next day. Mother insisted that she did not use drugs but she could not give the investigator an explanation for staying in the home with Father where drugs were being used and sold. Mother

---

[1] We use pseudonyms to refer to appellant, the children, and other family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8.

confirmed that she was aware that these activities were occuring in the home. Mother told the investigator that she was on probation for possession of a controlled substance and recently had passed a drug test. Mother said she was willing to take a hair follicle and urine test. The investigator found both children to be in good health and well-bonded with Mother.

Mother explained to the investigator that she was afraid to leave Father because of the history of domestic abuse between the two of them. Yet, Mother said that after the latest incident, she was finally "done" with Father. Mother said that she did not abuse drugs or alcohol and that the possession charge stemmed from her "taking the charge" for Father's uncle ("Uncle"). Mother provided a list of contacts who potentially could care for the children. All of Mother's contacts either declined to care for the children or were unsuitable because of a criminal record. When the investigator determined an emergency placement would be necessary, Mother cooperated in surrendering the children to the Department.

The Department earlier had investigated the family and "ruled out" the complaints. One of the prior reports contained allegations that Uncle and Mother had gotten into an argument and Uncle almost struck Mother and Adam with a metal flagpole. Another prior report contained allegations that drugs were being sold out of the home and that Father had used Mother's urine to falsify Father's results on a drug test. According to that report, Mother, Father, and Uncle would get into physical fights and during one of these fights, Father threw something and almost hit baby Adam.

Aside from Mother's "guilty" plea to the possession charge, evidence showed no criminal history. Father has a lengthy criminal history, which includes multiple charges of assault causing bodily injury against a family member, theft, and burglary. At the time of the investigation, three felony charges were pending

3

against Father from the gunshot incident that resulted in the Department's investigation.

**B. Trial**

*Harris County Sherriff's Office*

Deputy Jimmy Satterfield of the Harris County Sherriff's Office testified that in April 2017, he was called out on a "weapon disturbance call." The caller reported that Father fired a gun at her after she attempted to get a refund on marijuana she had purchased from him. When Satterfield arrived at the residence, he noticed the odor of marijuana and saw, in plain view, a bag of marijuana and a bag filled with a white powdery substance that later tested positive for cocaine. Satterfield testified that Mother told him a firearm was located in the garbage can near Father. According to Satterfield, the scene presented a dangerous situation for the children due to their access to the gun and the drugs in plain view in the home.

*Father*

Father confirmed that he had been convicted of attempted possession of a firearm by a felon and possession of cocaine as a result of the April 2017 incident. Yet, Father denied that he had ever fired a firearm. He testified that he did not know who brought the cocaine into his home. During Father's testimony, the trial court admitted into evidence Father's 2013 conviction of criminal trespass and Father's 2017 conviction of assault against Mother. The assault conviction stemmed from an incident in September 2016. According to the indictment in that case, Father struck Mother in the face while they were arguing. At that time, Mother was pregnant with Zach and Adam was seven months old. Father entered a plea of "guilty" to that offense. At the time of trial, Father was facing another family assault charge in Fort Bend County. He testified he did not know the origin

4

of this charge and would not confirm that the complainant was Mother.

Father testified that he was not living with Mother at the time of trial and had not lived with her, nor seen her, since the middle of the prior year, or eight months before trial. Father explained that he and Mother were evicted from their apartment in August 2018, and have not lived together since that time. Father said he had never been to the apartment where Mother was living at the time of trial. According to Father, he did not know whether Mother still had custody of the two younger children born to the couple after this investigation began. Father claimed that he and Mother had no contact. He confirmed that Fort Bend County opened a second investigation as to the two younger children as a result of an alleged domestic violence dispute occurring in August 2018, but Father testified that the alleged incident never occurred and that he was not present at the couple's residence when it was alleged to have occurred.

Father further testified that the last time he saw Adam and Zach was three months before trial, during a supervised visitation. Father said that the boys seemed to have "attitude problems" and were "acting out."

*Mother*

Mother denied using drugs and testified that she had been "clean" for six years. The Department introduced evidence showing Mother tested positive for cocaine and marijuana in May 2017. Mother testified that she had only ever used marijuana and had never used cocaine.

Mother confirmed that the domestic dispute with Father occurred in August 2018. She explained that she and Father had gotten into an argument about a trip to Galveston beach. Mother said Father pushed her against a wall, then pushed her down, and kicked her in the stomach. Mother said she and Father were evicted

from their apartment shortly after that incident. The Fort Bend County investigation regarding the couple's two younger children stemmed from the Galveston incident. Mother explained that she still has custody of her two younger children despite the Fort Bend investigation.

Mother acknowledged the 2016 domestic dispute in which Father struck her. Following the abuse, Mother continued living with Father and the couple went on to have three more children.

Mother confirmed that Father had hit or pushed her several times, both before and after the couple had children. Mother explained that she knew Father was a violent man before they began having children together. Mother denied that Father ever fired a gun during the 2017 incident and denied that she told Officer Satterfield that the gun was in the trash can.

Mother testified that she and Father separated in August 2018. According to Mother, she never sees Father, other than when he "sometimes comes to the door" to drop off diapers. Mother testified that she believed Father's parental rights should be terminated and that she would never be in a romantic relationship with him again.

Mother, who was twenty-one years old at the time of trial, was working between 30 – 40 hours a week at a laundromat. Before taking that position, she worked at a Dollar Store for more than a year. Mother also completed the requirements of her family service plan.

*The Department's Investigators*

One of the Department's caseworkers, Ciara Batchan, testified that Mother completed her service plan and had been living in the same apartment for six months. Mother attended all court hearings, maintained employment, and attended

6

most of her visits with the children, though she missed a few visits due to pregnancy. Mother tested positive for marijuana and cocaine in her first drug test in May 2017. Since that time, all her drug tests returned negative.

According to Batchan, the Department wanted to terminate Mother's parental rights, despite the completion of her service plan, because Mother demonstrated an inability to be protective of the children. The Department was concerned due to the incidents of domestic violence, and Mother's decision to continue living with Father despite his criminal history. Batchan explained that throughout the investigation Mother continually failed to demonstrate that she would apply what she learned in her parenting classes and that Mother was not protecting her children from Father.

Batchan testified about her suspicions that Mother and Father still were involved in a romantic relationship. Investigators in the Fort Bend case had reported seeing Father's vehicle at Mother's home. Batchan acknowledged, however, that she lacked definitive proof or personal knowledge that Father was living with Mother. Batchan reiterated that the Department's main concern was Mother's inability to "defend herself or remove herself from the situation." Additionally, as a result of the Department's interactions with Mother in both of the cases, the Department has become concerned with Mother's truthfulness.

Batchan further testified that Adam and Zach were in a foster placement where they were receiving love and care. The foster family would like to adopt the boys. According to Batchan, Adam and Zach "know of mom," but they are more closely bonded with their foster parents than with Mother.

Claudia Sorto, another Department caseworker, testified that she has attempted to visit Mother at home on at least eight occasions, but has been into the home only once. On one occasion, Mother did not allow Sorto into the home and

on all other occasions Mother was not home. Sorto called law enforcement for a welfare check on Mother's home one night because she was concerned about the children. A male answered the door and identified himself as Father's brother and provided identification documents. However, the officer's body-cam recorded the male's face and he later was identified as Father.

*Maternal Grandmother*

Mother's mother ("Grandmother") testified that Mother is a good mother, but Grandmother shared concerns about the children, noting she was afraid for the children's safety in Father's presence. Grandmother testified about an incident in which she watched Father get into a fight with someone and then intentionally hit that person with his vehicle. According to Grandmother, the family, including Mother and Father, spent the past Christmas together at Mother's apartment, just four months before trial. Grandmother and Father were both present at the hospital when Mother's and Father's fourth child was born, just three months before trial. Grandmother also explained that she was aware Father would sneak into Mother's apartment through the back balcony. Additionally, Grandmother testified that Father was present at Mother's apartment just two months before trial for one of the children's birthday celebrations. Grandmother shared her belief that Mother made a bad decision to stay in a relationship with Father. She said that she initially told her daughter to stop seeing Father when she found out that Father was selling drugs. At the time of trial, Grandmother did not believe that Mother should have custody of Adam or Zach. Grandmother confirmed that Mother and Father are still in a romantic relationship.

*Foster Mother*

The children's foster mother ("Foster Mother") testified that Adam and Zach are doing very well in her home. At the time of trial, the boys had been living with

her family for almost two years and were two and three years old. Foster Mother and her husband would like to adopt the boys. Both young boys are medically and developmentally on target and Foster Mother regularly takes them to the pediatrician. According to Foster Mother, the boys are well-bonded and "attached" to her two older daughters. They love to sing, dance, and attend church with the family. Foster Mother testified that the boys never ask about Mother. The boys each have their own bedroom and the family has two dogs that the boys love.

*Guardian Ad Litem*

The guardian ad litem opined that it would be in the children's best interest to terminate Mother's parental rights.

*Final Decree of Termination*

The trial court signed a final decree of termination terminating Mother's parental rights under subsections 161.001(b)(1)(D) and (E) of the Family Code. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E). The trial court further found it would be in the boys' best interest to terminate Mother's parental rights. This appeal followed.

## II. ISSUES AND ANALYSIS

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1); and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Mother argues the record evidence is insufficient on the predicate termination grounds and on the issue of best interest.

### A. Standard of Review

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental-termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Yet, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the

10

disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the fact finder's findings and we do not substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

### 1. Endangerment Under Subsection (E)

Mother argues the evidence is legally and factually insufficient to support termination under sections 161.001(b)(1)(D) and (E). Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the children's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We begin by addressing the trial court's finding under subsection (E).

In reviewing a subsection (E) finding, we are mindful of the requirement that Mother's appeal be meaningful and that we detail our analysis of the sufficiency of the evidence supporting an (E) finding. *In re P.W.*, 579 S.W.3d 713, 725 (Tex. App.—Houston [14th Dist.] 2019, no pet.). By making the (E) finding, the trial court found that Mother engaged in conduct or knowingly placed Adam and Zach with persons who engaged in conduct that endangered their physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E). A finding of endangerment under subsection (E) requires evidence that the endangerment resulted from the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination of the parent-child relationship under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. A court properly may consider

11

actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

Mother admitted that Father physically abused her on numerous occasions both before and after Zach and Adam were born. Specifically, during trial, she estimated that Father had physically assaulted her at least ten times before the children were born. In April 2017, Mother told Department investigators that she was finally "done" with Father after he was arrested. By August 2018, Mother and Father were living together again. During that period, Mother reported that Father pushed her down against a wall and kicked her. Mother testified that she and Father finally were finished after this incident. Yet, Grandmother testified that Mother and Father were still in a romantic relationship and had spent time together as recently as two months before trial.

Evidence of domestic violence may be considered as evidence of endangerment under subsection (E). *In re K-A.B.M.*, 551 S.W.3d 275, 286 (Tex. App.—El Paso 2018, no pet.). A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Domestic violence,

want of self-control, and propensity for violence may be considered as evidence of endangerment. *Id.*; *see In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (considering mother's having "exposed her children to domestic violence," as evidence of endangerment under subsection (E)); *see also Sylvia M. v. Dallas Cty. Welfare Unit*, 771 S.W.2d 198, 204 (Tex. App.—Dallas 1989, no writ) (considering "volatile and chaotic" marriage altercation during pregnancy and mother's repeated reconciliation with abusive spouse). Violent conduct by a parent toward the other parent may produce an environment that endangers the physical or emotional well-being of a child. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Considering all the evidence in the light most favorable to the (E) finding, assuming the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved, being mindful of any undisputed evidence contrary to the finding, and considering that evidence in our analysis, we conclude that a reasonable factfinder could form a firm belief or conviction that Mother engaged in conduct or knowingly placed the boys with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(E); *Sylvia M.*, 771 S.W.3d at 203-04 (considering a mother's repeated conciliation with an abusive father as evidence of endangerment).

As noted above, in reviewing the factual sufficiency of the evidence we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631. Mother testified that since August 2018, she has seen Father briefly to drop off supplies for the children. Father testified that he has not seen Mother at all since August 2018, and that they

have no contact. Grandmother testified that Mother and Father spend holidays and birthdays together and that the two were together as recently as two months before trial. According to Grandmother, Father often sneaks into Mother's apartment. Grandmother and Mother both confirmed Father is physically abusive toward Mother, though Father denied ever hitting Mother.

Considering and weighing the disputed evidence contrary to the finding against all the evidence favoring the finding, giving due deference to the trial court's findings, and after an exacting review of the entire record with a healthy regard for the constitutional interests at stake, we conclude that in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that Mother engaged in the conduct described in subsection (E). *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.O.A.*, 283 S.W.3d at 345. Thus, the trial evidence stands factually sufficient to support the trial court's subsection (E) finding.

Because we conclude the evidence is legally and factually sufficient to support the trial court's finding terminating Mother's parental rights under section 161.001(b)(1)(E), we do not address Mother's challenge to the trial court's finding under subsection (D). *See In re T.M.T.*, No. 14-18-00442-CV, 2018 WL 6053667, at *11 (Tex. App.—Houston [14th Dist.] Nov. 20, 2018, no pet.) (mem. op.).

## 2. Best Interest of the Children

Texas courts presume that keeping children with their natural parent serves the children's best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department carries the burden of rebutting that presumption. *Id.* Proof of acts or omissions under section 161.001(b)(1) is probative of the best-interest issue. *See In re S.R.*, 452 S.W.3d at 366. The

considerations the trier of fact may use to determine the best interest of the child, known as the *Holley* factors, include:

(1) the desires of the children;

(2) the present and future physical and emotional needs of the children;

(3) the present and future emotional and physical danger to the children;

(4) the parental abilities of the persons seeking custody;

(5) the programs available to assist those persons seeking custody in promoting the best interest of the children;

(6) the plans for the children by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parents' acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the children with a safe environment). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

## 1. The desires of the children

At the time of trial, the boys were two and three years old. Zach had been living with the foster family since he was three months old. Adam had been with the family since he was seventeen months old. Foster Mother testified that the boys never ask about Mother. Evidence shows Mother made nearly all of her scheduled supervised visits with them. When children are too young to express their desires, the factfinder may consider their circumstances, for example that a child has bonded with the foster family, is well cared for in the current placement, and has

15

spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Foster Mother testified that the boys are bonded with her entire family. According to Foster Mother, the boys are "very attached to" their older foster sisters.

### 2. The stability of the home or proposed placement

Texas courts recognize as a paramount consideration in the best-interest determination the children's need for a "stable, permanent home." *See In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the children is relevant to the best-interest determination. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

Mother and Father were evicted from their most recent apartment in August of 2018, for failure to pay rent. Before that, Father allegedly was selling drugs out of their apartment and police found a gun there. According to the Department investigator and Grandmother, Father often visits Mother's new apartment.

The foster parents have provided Zach and Adam with a stable home, free of crime, domestic abuse, and drugs. The foster family attends church on a weekly basis and each boy has his own bedroom in their home.

### 3. Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate and any excuses for acts or omissions.

The evidence shows a pattern of Mother returning time and again to an abusive relationship. Mother allowed her one-month-old infant (Zach) and one-year-old toddler (Adam) to live in a home with drugs and a gun easily accessible to young children. Mother's only responses for these actions was her assurance that each time would be "the last time." Mother told the trial court that she never sees Father, except briefly when he drops off baby supplies. Grandmother testified she

16

had seen Mother and Father together on many occasions. Mother denied that she was still in a romantic relationship with Father. Mother proffered no explanation for her positive drug test. Instead, she denied any drug use. Mother accepted no responsibility for her poor choices. Though Mother completed her family services plan, Mother did not show an ability to learn from her mistakes or from her parenting classes.

#### 4. The present and future emotional and physical danger to the children

As already discussed, the evidence supports the trial court's finding that Mother engaged in conduct or knowingly placed Adam and Zach with persons who engaged in conduct that endangered their physical or emotional well-being. Evidence supporting termination of Mother's parental rights under the grounds listed in section 161.001(b)(1) also can be considered in support of a finding that termination is in a child's best interest. *See In re C.H.*, 89 S.W.3d at 27. A fact-finder also may infer that past conduct endangering a child's well-being may recur in the future if the child is returned to the parent. *In re A.J.E.M.-B.*, No.14-14-00424-CV, 2014 WL 5795484 at *16 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.). This factor weighs in favor of termination.

Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in the children's best interest.

### III. CONCLUSION

Having found the evidence legally and factually sufficient to support the trial court's finding terminating Mother's parental rights under section 161.001(b)(1)(E) and that termination is in the children's best interest, we affirm the judgment of the trial court.

17

/s/        Kem Thompson Frost
Chief Justice


Panel consists of Chief Justice Frost and Justices Wise and Hassan.